THE PEOPLE, *ex rel.* SMITH *et al., v.* PEASE.

Upon the trial of a *quo warranto* to determine the title to an office depending upon a general election, the question is who received the most legal votes.

The inspectors of elections are not judicial, but administrative officers: their decision is final only as to receiving or rejecting votes; but the question whether a voter was or was not entitled to vote, is open to examination in subsequent proceedings upon any competent evidence.

It seems that the inspectors have no authority to reject a vote except in the special cases where it is expressly given by the statute, as when the voter refuses to take the oath, or to answer questions, stands convicted of crime, or has made a bet on the election.

A voter called as a witness may be asked for whom he voted, and, if he declines or is unable to state, circumstantial evidence may be used to ascertain the fact, and he may be asked for whom he intended to vote, as one of the circumstances bearing upon the question.

For the purpose of showing that a person voted, the poll-list kept at the election is admissible, though not signed by the inspectors or clerks, having no heading denoting its character, and never having been filed in the town clerk's office.

Where a voter is proved to have been alien born, and there is *prima facie* evidence that he had not become a citizen by naturalization or otherwise, the burden of showing that he has become a citizen is cast on the party desiring to retain the vote; and, in the absence of such evidence, the vote is to be disallowed.

But where the evidence is only that one had voted and was alien born, the presumption is that he voted legally, and had qualified himself by naturalization.

ACTION in the nature of a *quo warranto*, brought in January, 1858, to try the title to the office of county treasurer of the county of Lewis. The action had been twice tried. On the first trial the defendant obtained a verdict, which was set aside on a bill of exceptions, and a new trial ordered. (30 Barb., 588.) On the second trial the defendant again obtained a verdict, upon which judgment was entered in his favor, which was affirmed at the general term, and from that affirmance the plaintiff brought the present appeal.

The plaintiffs proved on the second trial, by the certificate of the board of county canvassers of the county of Lewis, showing the result of the general election in that county in November, 1857, that the whole number of votes given at that election for the office of county treasurer was three thousand and four hundred; that of those votes

| | |
|---|---|
| The relator, Moses M. Smith, received | 1,683 |
| Moses Smith | 2 |
| M. M. Smith | 17 |
| | 1,702 |
| The defendant, Diodate Pease, received | 1,694 |
| D. Pease, | 3 |
| Deodate Beas, | 1 |
| | 1,698 |

It was also proved that the relator had been a resident of Lewis county for twenty years, and during that time had been in business as a merchant; had held the offices of sheriff, deputy sheriff and county treasurer; that it was his practice, in his private and official business, to sign his name M. M. Smith, and to advertise his business by that name; the same name was on his sign at his store, and letters were usually so addressed to him. Several old residents of the county testified that they were well acquainted throughout the county, and had never heard of any M. M. Smith, other than the relator.

A motion for a nonsuit on this evidence was denied. The defendant then proved that he was nominated as a candidate for the office of county treasurer of Lewis county, by a county convention, in that county, in the fall of 1857, and was voted for as such, at the election held on the 3d of November, in that year. Among the witnesses called by him was Peter Rivinot, who testified that he voted for the defendant as county treasurer at that election, in the second election district in New Bremen, Lewis county. On cross-examination, this witness testified that he was born in France.

John Kent was called in behalf of the defendant and testified that he voted for county treasurer, at Constableville, in said

county, at that election. He was then asked the question: " For whom did you vote for county treasurer at that election ? " The defendant, in connection with this evidence, offered to show that the witness voted for the relator, and that he was not a legal voter. The plaintiff objected to this evidence as incompetent, on the grounds:

1. That a voter cannot be thus interrogated.

2. That he cannot be so interrogated when the purpose is to establish that he voted without a right to do so, and thus committed a crime or misdemeanor.

3. That the determination of the inspectors of election to receive his vote was final and conclusive.

4. That the return of the inspectors, showing the result of the election, after estimating the votes received by them, was conclusive.

5. That the vote, when received, is effectual for all purposes, except for the voter's defence, in proceedings against him for illegal voting.

6. That persons whose rights are to be affected by the adjudication are not parties to this action, that is, the voters themselves.

The court overruled the objection, and the plaintiffs' counsel excepted.

The witness stated that he could not say positively for whom he voted, but he thought it was Smith; and that he went to Constableville from Boonville, Oneida county, after July 4, 1857. Quite a number of witnesses were examined, for the purpose of showing, by their testimony, that they voted for the relator, for county treasurer, and were not legal voters. With regard to some of them, the testimony tended to establish those facts. Among those witnesses was Sebastian Hoch, who testified that he was born in Germany, in June, 1832, and never got naturalization papers. The plaintiffs claimed that the presumption of law, on this state of facts, was that his father was naturalized whilst he was a minor. The court ruled that the burden of showing him a citizen was now cast upon the plaintiffs; to which ruling the plaintiffs excepted.

With regard to another witness, the plaintiffs objected that must be proved that he voted for the relator, before evidence could be received of his incapacity to vote. The objection was overruled, the plaintiffs excepted, and the evidence was received.

Thomas R. Loftis testified that he voted at that election, but could not tell for whom he voted for county treasurer, or of whom he got the ticket; that it was not read to him; that he could not read, and could not say that he opened the ticket, or that he knew at the time which ticket he voted. He was then asked: "What ticket did you intend to vote?" This was objected to, the objection was overruled, and the plaintiffs excepted. The witness answered: "I designed to vote the democratic ticket; I don't know as I have any doubt that I did; I did not know Smith till after this suit began; only know him by sight now; I did not cross any names from my ticket."

Conrad Hoch testified that he voted for Smith for county treasurer, in District No. 2, in Croghan. On cross-examination he said: "I read no English; nobody read the names on the ticket I voted; I don't know of whom I got it; it was said Smith's name was on the ticket; that is all I know about it; I noticed two kinds of tickets were peddled that day; I believe I peddled one kind; it was called the democratic ticket; that is all I know about it." The plaintiffs moved that his testimony be stricken out as hearsay and incompetent. The motion was denied, and the plaintiff excepted.

Peter Bellinger testified that he voted, at Constableville, for the relator as county treasurer; for the year before he had resided in Jefferson county, St. Lawrence county and Canada; that he resided in Lewis county, from 1845 to 1855, when he went to St. Lawrence county, and in 1856 he was married at Canton, in that county; that he lived with his wife, at Canton, four months, and had not lived with her since; that he went from Canton to Canada, and got back to Watertown, in Jefferson county, in June, 1857, and went from there to Constable-

ville the latter part of July, 1857; that his wife still remained at Canton.

The defendant offered in evidence the poll list of District No. 2, in New Bremen, to show that Francis L'Huillier, one of the witnesses who had been examined, voted in that district at that election, it being claimed that his residence was in Croghan, and that he was an alien. It was objected to by the plaintiffs as incompetent; that it did not prove that the witness voted; that there was no heading, to show what the paper was; that it was not signed by the inspectors of election or clerks; that it appeared to have been filed June 15, 1857, and was not proved to have come from the clerk's office. The objection was overruled, and the plaintiffs excepted.

The poll list of Croghan was received (under like objection and exception), to show that L'Huillier did not vote in that town.

Several exceptions were taken, on the examination of other witnesses, presenting questions similar to those taken on the examination of Thomas R. Loftis and Conrad Hoch.

When the testimony on the part of the defendant was closed, the plaintiff's counsel requested the court to rule that no proof had been given to go to the jury sufficient to overcome the five majority conceded to the relator, of the votes given. The request was denied, and the plaintiffs' counsel excepted.

The plaintiffs then called William McRea as a witness, and offered to prove by him, that he voted for the defendant: was an alien, and had never been naturalized. The defendant objected to this testimony, on the ground that, at the close of the plaintiffs' testimony, they reserved, by permission of the court, the right to call certain witnesses named, who were not then present, to show that illegal votes had been cast for the defendant; and that the witness called was not one of them. The plaintiffs claimed the right to give the evidence offered as strictly rebutting testimony. The objection was sustained, and the plaintiffs excepted.

The plaintiffs proved that, at one or more of the polls,

democratic tickets were circulated and voted, with the name of the defendant on them for county treasurer, instead of the name of the relator.

The judge charged the jury that they must inquire upon the evidence, not which candidate had the most votes, but which had the most lawful votes. To this the plaintiffs' counsel excepted. Also that they must strike out and disallow all votes which they were satisfied, upon the evidence, were given by men who had not the lawful right to vote. To this the plaintiffs' counsel excepted.

That, as to Bellinger, if he got married and went to live with his wife in another county, with intent to make that county his residence, that fact constituted a change of residence. To this the plaintiffs' counsel excepted.

The judge also charged, that when it was proved that a voter was alien born, and there was *prima facie* evidence that he had not become a citizen by naturalization or otherwise, the vote given by him must be stricken out; that the burden of proving citizenship was then cast upon the voter. To this the plaintiffs' counsel excepted.

The judge refused to charge the jury, in the case of Rivinot, that if they found that he voted for the defendant and was alien born, then, in the absence of any proof of naturalization, his vote must be disallowed; and did charge, that in such case the legal presumption was that he had been naturalized. To this refusal and charge the plaintiffs excepted.

The plaintiffs' counsel then requested the court to charge, that when one who was alien born voted, the presumption was that he was a voter; and that one claiming that he was not a lawful voter, had the burden of showing that he never became a citizen by any of the ways in which he could have been admitted. The court refused to charge in accordance with so much of the request as stated what was required to be proved.

*James F. Starbuck*, for the appellant.

*Francis Kernan*, for the respondent.

DAVIES, J. The charge of the judge, at the trial, and the exception taken by the relator, present the main question in controversy in this action, and the only one of importance demanding consideration. It is certainly a question far-reaching in the results which must follow its determination, for upon its just decision must depend the value and purity of the elective franchise. When we reflect that, under the present constitutional provisions prevailing in this State, we not only elect all legislative officers, but most of our judicial, executive and administrative, it cannot fail to be seen how vital it is to the success and permanency of our institutions that the voice and will thus expressed be that of those constitutionally qualified thus to speak. It is of but little moment that constitutional qualifications, as preliminary to the exercise of the elective franchise, are prescribed, and that those thus entitled exercise that right, inestimable to freemen, if persons having no such qualifications may exercise the same right, and thus thwart and subvert the will of the legal voters. Such certainly could never have been the intent of the framers of our system of government, and such results, it has not been heretofore supposed, were to be anticipated from our elective system.

By section 5 of article 1 of the Constitution of the United States, each house is declared to be the judge of the election returns and qualifications of its own members. A similar provision, as applicable to our State legislature, is found in the Constitution of this State. (§ 10, art. 3.) And a like provision in most if not all of the charters of the various municipal corporations of this State will be found, as applicable to the election of the members of the common councils thereof. So far as I have been able to discover, the rule is universal in all legislative bodies, upon inquiries as to the election of members thereof, to scrutinize the qualifications of the voters and to deduct or disallow all votes cast for any candidate by non-qualified voters. This rule seems to be well established in such cases, and it is not perceived that any substantial reason can be suggested why a different rule should obtain in a civil suit or proceeding to determine the right of an individual to a

particular office. This rule was distinctly recognized and affirmed by the House of Representatives in the election case of Vallandigham and Campbell. (Cong. Globe, vol. 41, p. 2317, and following.) In the extended debate had upon that case, all the members conceded that the votes of illegal or non-qualified electors must be deducted or disallowed; and the main point of difference in the discussion was as to the manner of establishing such disqualification. It was contended by some members that it could only be shown by the oath of the voter himself, while others maintained that hearsay evidence of such disqualification was admissible. Numerous precedents are cited at page 2320, fully sanctioning the doctrine that hearsay evidence can be received. At page 2319, a case was cited, where, before the election committee of the House of Commons, in England, Mr. Maule objected that the declarations of one John Nowlan were not evidence against the sitting member. Mr. Thessiger, since Lord Chancellor, now Lord CHELMSFORD, in reply, said: "In the Southampton case it was held evidence may be given of the declaration of a person, even after voting, though it may tend to affect him with penal consequences. In the Ripon case the voter had stated to two persons, in the months of June and July, 1832, that he had no vote, and that his aunt was tenant of the house; the election took place in the beginning of 1833, and the declarations were held admissible. A voter who has voted for the sitting member is always considered as a party, and it is on that ground that his declarations are admissible. The question is always considered to be between the voter and the party questioning his vote, and not merely between the sitting member and the petitioner." The committee resolved that the evidence should be received.

The Constitution of this State declares who may exercise the elective franchise. Those entitled to vote at any election are, every male citizen of the age of twenty-one years who shall have been a citizen for ten days and an inhabitant of this State for one year next preceding any election, and for the last four months a resident of the county where he may

offer his vote. (§ 1, art. 2.) It follows that none others than those possessing these qualifications can lawfully vote.

All votes are to be by ballot, and offered to the inspectors of election, on the day of the election, and it is made, by statute, the duty of each inspector to challenge every person offering to vote, whom he shall know or suspect not to be duly quali-fied as an elector. (1 Rev. Stat., 5th ed., p. 433, § 36.) And section 41, same page, declares that in case any inspector of election shall knowingly and willfully permit or suffer any person to vote at any election, who is not entitled to vote thereat, the said inspector so offending, on conviction, is to be adjudged guilty of a misdemeanor. If a person offering to vote is challenged, it is made the duty of the inspectors to administer to the voter the preliminary oath prescribed by the statute, and to put such questions to the voter as may tend to show his right to vote; and if any person shall refuse to take such preliminary oath, or to answer fully any questions which shall be put to him, his vote shall be rejected. (1 Rev. Stat., 5th ed., p. 430, §§ 18–20.) If the person offering to vote shall persist in his claim to vote, after the inspectors shall have pointed out to him wherein his right to vote shall appear to them deficient, the inspector shall then, if the challenge is not withdrawn, administer the general oath set forth in the statute. If the oath is refused to be taken, the vote is to be rejected. (Id., pp. 430, 431, §§ 21, 22, 24.)

It is seen, therefore, that the inspectors have no authority, by statute, to reject a vote, except in the three cases: after refusal to take the preliminary oath, or fully to answer any questions put, or on refusal to take the general oath. And the only judicial discretion vested in them is to determine whether any question put to the persons offering to vote has or has not been fully answered. If the questions put have been fully answered, and such answers discover the fact that the person offering to vote is not a qualified voter, yet if he per-sists in his claim to vote, it is imperative upon the inspectors to administer to him the general oath, and if taken, to receive the vote and deposit the same in the ballot box. These are

all the safeguards the legislature have thought proper to provide to insure the prevention of fraudulent or illegal voting, and this leaves but little discretion to the inspectors. Their duties, except in the single instance adverted to, are simply ministerial in the reception of the votes, and entirely so in counting and making returns thereof. The legislature have left to those bodies having the power to judge of the return and election of their own members, to correct any abuses which may have resulted in such election, and to judicial investigation, where the legal rights of individuals are concerned or affected, to apply such remedies as the nature of the case calls for.

An action is prescribed by law, in the nature of a *quo warranto*, to determine, as well the question of usurpation of the person in office as the claim of the person asserting his right thereto. In this action, the determination disposes as well of the public interest as the private right. It is not of so much importance, so far as the public is concerned, which of two claimants shall discharge the duties of an office; but the private right of an individual to the fees and emoluments of an office is properly and legitimately the subject of judicial cognizance, and to adjudicate upon this right, it becomes essential to determine who was legally and duly elected or appointed to it, and who entitled to discharge its duties and receive and enjoy its fees and emoluments. The provisions of the Code, in reference to this action, are ample to cover and secure, as well the interests of the public as the private rights of the parties. The determination of those rights necessarily leads to an investigation into the title of the claimant to the particular office, and such investigation must result in a determination of the legality of the election or appointment of the one or of the other.

It is made the duty of the board of county canvassers, upon the statement of votes given, to determine what person, by the greatest number of votes, has been duly elected to any office mentioned in said statement. (1 Rev. Stat., 5th ed., p. 438, § 10.) County treasurers of the several counties of this State are to be elected at a general election and hold their office for

three years. (Id. p. 406, § 17.) And the certificate of the board of canvassers authorized to canvass the votes given for any elective office, is made evidence of the election of the person therein declared to have been elected. (Id., p. 410, § 22.) But such certificate is only *prima facie* evidence of the title of the person receiving it, to the office therein mentioned. In all cases where the proceeding is by *quo warranto*, or in an action of that nature, it is held that such proceeding is instituted to try the right to the office directly, and it is competent to go behind the certificate, which would otherwise be conclusive, to ascertain the real facts of the case. (*The People v. Seaman*, 5 Denio, 409; *People* v. *Ferguson*, 8 Cow., 102; *People* v. *Van Slyck*, 4 id., 297; *People* v. *Vail*, 20 Wend., 12.) In this last case, BRONSON, J., says: "Such proceeding reaches beyond those evidences of title which are conclusive for any other purpose, and inquires into and ascertains the abstract question of right." He also says: "In those legislative bodies which have the power to judge of their own members, it is the settled practice, when the right of the sitting member is called in question, to look beyond the certificate of the returning officer; and I think a court and jury, with better means of arriving at truth, may pursue the same course." But while it is conceded that this proceeding is to ascertain the very right of the person to the particular office, and that by means of it any negligence, mistake or fraud of the inspectors or canvassers in their proceedings may be corrected, yet it is contended, if the inspectors have received and allowed votes to a party, given by persons not qualified to vote, such proceeding is final and conclusive, and the party thereby defrauded of an office to which he was duly elected, by having received the greatest number of legal and qualified votes, has no remedy, but must submit, as well to the loss of the office as of the fees and emoluments growing out of it. I cannot assent to such a proposition. What is it that confers title to the office, and the legal right to the reception of its emoluments? It surely is the fact that the greatest number of qualified voters have so declared their wishes at an election

held pursuant to law. · It is not the canvass, or estimate, or certificate which determines the right. These are only evidences of the right, but the truth may be inquired into, and the very right ascertained. When it is so ascertained, the legal consequences follow that the person usurping the office is ousted, the person legally entitled takes the office and its fees, &c., and recovers from the usurper the fees or emoluments belonging to the office, received by him, by means of his usurpation thereof. If the term of the office should have expired before the final determination of the question, it follows that the successful party cannot take the office, but he will be none the less entitled to recover the fees and emoluments to which he was legally entitled, which may have been received by the usurping claimant. Now, can a person be deprived of the fees, &c., by the votes of persons not qualified to cast them? It would seem that the statement of the proposition furnishes its own answer. The Constitution prescribes who may vote, and it is needless to say that none others can lawfully do so. But if, through inadvertence, fraud or mistake, the votes of persons having no right so to vote are taken and counted for a particular candidate, and he is thereupon, by reason of counting and allowing such votes to him, declared duly elected to a given office, and enters upon the discharge of its duties, and receives the fees and emoluments pertaining thereto, can he interpose such illegal votes to the claim of the person rightfully elected by the greatest number of legal and qualified voters? Can he make title to the office by the votes of those who have no legal or constitutional right to vote—in other words, by the wishes of those not voters? In my opinion, clearly not. The very right to the office is determined by the fact, to whom was the greatest number of legal and duly qualified votes given? Or suppose that instead of the voting having been by ballot, it had been *viva voce*, and the relator in the present case had 1,702 persons declaring for him, for county treasurer, and the defendant 1,698, and of those declaring for the relator it conclusively appeared on the trial that ten, fifteen or twenty of those thus declaring for him were women, minors

or aliens, and thus not voters, and that all those declaring for the defendant possessed the legal qualifications of voters, could there be a moment's doubt as to which was legally entitled to the office ? I do not see that there could, and the supposed case is, in substance, that now under consideration. How can those who have no legal right to interfere with or be heard at an election, deprive the legal and qualified voters of their legitimate choice, or the person duly elected by them to an office, of its emoluments and advantages ? A vote is but the expression of the will of a voter; and whether the formula to give expression to such will be a ballot or *viva voce*, the result is the same : either is a vote. It is a paradox to say that a vote can be given by one not a voter, and as it is the greatest number of votes which elects a candidate and gives title to the office, it follows logically that those ballots given or handed in by persons not voters are not votes, and cannot, therefore, be rightfully estimated or have any influence upon the result. Ordinarily there would be great difficulty in separating or ascertaining which ballots are legal and which have no validity whatever, as being given by non-voters. But in the case at bar it is clearly ascertained that five ballots or votes given and counted for the relator were cast or given by persons not qualified to vote, and he consequently, in truth and in fact, had five votes less than have been counted and allowed to him. They must, therefore, be subtracted from the total vote allowed to him, and such subtraction leaves him a less number of votes than were given for the defendant.

In the case of *People* v. *Van Slyck (supra)*, JONES, *arguendo*, says : " To make a choice of the defendant within the provisions of the statute, there should be a majority of legal votes ;" and such seems evidently to be the view of the court. It hardly needs argument or illustration to show that the votes, contemplated by the framers of the Constitution and by the legislature, in declaring the person having the greatest number of votes should be elected and entitled to the particular office, meant thereby legal votes, those and those only cast by voters possessing the constitutional qualifications. In my

opinion, ballots cast by females, minors, aliens, or those not having the constitutional qualifications, are not votes within the meaning and intent of our Constitution and election laws. Cole on Quo Warranto (p. 110), citing a number of English cases, lays down these propositions, which harmonize with the views already suggested. He says that the party may not have been duly elected. This may happen, although he was " qualified " to be elected, and the election itself was neither void nor irregular, as when he did not obtain a majority of legal votes. The burgess roll is *prima facie* evidence of a party's right to vote as a burgess, at an election. Indeed, no question can be put to him as to his right to vote, but only to his signature to the voting paper delivered in by him, and his identity with the person named in the burgess roll, and whether he has already voted at that election. But the burgess roll is not conclusive as to the voter's title, upon an application for a *quo warranto* information against the party elected, and, therefore, the relator may show by affidavit that although the defendant had a colorable majority at the election, yet that certain of his votes were bad ones, for specified reasons, and that, deducting such bad votes, the relator or some other candidate had the majority of legal votes. So it may be shown that some of the voting papers for the defendant were defective and insufficient, and that deducting them the defendant had not a majority of legal votes. The same doctrine was enunciated in the case of *Rex* v. *Vice Chancellor, &c., of Cambridge* (3 Burr., 1647), where a mandamus was awarded to put the Earl of Hardwicke into the office of High Steward of the University of Cambridge, on the ground that one of the votes given against him, which produced a tie, was an illegal vote, cast by a person not having the right to vote. The proctors had declared the vote to be equal, and, therefore, no election. Lord MANSFIELD, after discussing the qualifications of Mr. Pitt, whose vote had been given against the Earl of Hardwicke, and thereby produced a tie, arrived at the conclusion that he was not a legal voter; and if so, he says, there is a majority of one for Lord Hardwicke, unless the other side can disqualify some of those who

voted for him. He further says: "The declaration of the
proctors cannot affect the substantial right. The right of
election appears to be in Lord Hardwicke, and I am very
clear that the foundation of the rule should be the election."
Justice WILMOT said: "As to the declaration of the proctors,
I think it immaterial, for the question depends, not upon that,
but upon the real majority of legal votes. This declaration
cannot alter or affect that. If they had made a declaration,
and even if such their declaration had been contrary to the
truth of the fair and real right, the court must have taken up
the matter upon the true and real merits; for the right to the
office attached in Lord Hardwicke, upon his having a majority
of legal votes. If he had a real right, this court ought to give
activity to it; and the omission of a declaration of the proctors,
or the falsity of it, cannot affect their judgment concerning
the legality of the right." Therefore, he adds, "Lord Hard-
wicke had the majority of legal votes."

We have seen, from the authorities and cases cited, that the
practice is universal, when a scrutiny is instituted to determine
the right to an office by legislative bodies, to reject all votes
given or cast by persons not duly qualified to vote; and upon
such investigation, the declarations of the person casting the
vote have been admitted and received as evidence of his quali-
fication or want of qualification. It is hearsay evidence, and
yet, upon well-settled and uniform practice, has been allowed.
The learned note to 3 McCord's Reports (p. 230), on hearsay
evidence, distinctly announces this doctrine. He says, under the
23d head, the declaration of a voter may be given in evidence
to set aside the election; as to diminish the poll, by taking an
incompetent vote off, or to prove bribery, &c., but they are not
admissible on a charge against the candidate for bribery, &c.
They are admitted to annul votes, but not to set aside the elec-
tion by disqualifying the member on account of his bribery, &c.
(Citing the case of *Milborne Port*, 1 Doug. Election Cases, 67;
*Case of Joel Chester*, 1 id., 76; *Petersfield Case*, 3 id., 6; *Worcester
Case*, 3 id., 129; *Shaftsbury Case*, 3 id., 150.) This doctrine is
referred to with approbation in Cowen & Hill's Notes (vol. 2,

p. 322), and the learned note in 3 McCord is referred to as the source from which the editor had obtained the remarks and references quoted by him.  These writers, and the cases cited by them, distinctly recognize the doctrine that upon a scrutiny had, in reference to the validity of an election, the votes given by unqualified voters may be deducted to diminish the poll by being taken off as incompetent, and the votes so given may be annulled or disregarded or rejected.  In the case at bar the disqualification was proven by the voter himself; but these authorities abundantly sustain the position that the declaration of the voter, as to his want of qualification, would have been admissible and legal evidence.

It is urged, however, that the act of the inspectors, in receiving and depositing the ballot, is judicial, and, therefore, cannot be reviewed in this action.  It is supposed that the contrary has been satisfactorily shown, and that the universal practice of the courts, in actions or proceedings like the present, where they have inquired into the very right of the case, refutes this assumption.  In the case of *The People* v. *Van Slyck* (*supra*), it was urged by the counsel for the defendant that the certificate of the determination of the board of canvassers was conclusive evidence of the election; that it could neither be impeached nor contradicted; that the authority exercised by the board of canvassers was judicial, and that if the Supreme Court had jurisdiction to review the determination of the board of canvassers, their reviewing power could only be exercised through the medium of a *certiorari*, and until reversed in this form, it remains valid and conclusive, and cannot be questioned by an information in the nature of a *quo warranto*, These views were repudiated by the court, in that case, which held that the act of the canvassers was not judicial, but merely ministerial, and that the trial, in *quo warranto*, is had upon the right of the party holding the office.  This doctrine was promulgated nearly forty years since, in this State, and has, so far as I can ascertain, been acquiesced in and sustained in all cases, and I think it ought not now to be disturbed.  In *The People* v. *Ferguson* (*supra*), it was urged that the court

could not go behind the ballot boxes, that such a principle would be of the most dangerous tendency. Chief Justice SAVAGE most correctly said that the object of an election is that the person receiving the greatest number of votes in his favor shall have the office designated by the electors; that he could not assent to the proposition that you may not look beyond the ballot boxes for testimony, because of the danger of perjury and subornation of perjury. He considered the question fairly before a jury, and to be proved, like all other facts, by the best evidence that the nature of the case admits of.

We are much pressed with the argument that it would be attended with great inconvenience if we permit a party to try his right to an office by showing that his adversary received a greater number of illegal votes than the ascertained majority given him. It is said that in a general State election the time necessarily occupied in such a trial might consume more than eighty-three years. It is the first time I have ever heard it urged that a party who had a conceded right should not have a remedy to enforce it, because a large consumption of time would take place before his right could be established. If a party has a legal title to an office, it surely can be no legal reason for denying him the opportunity to establish it, that such process will require the examination of a large number of witnesses and consume much time in the proceeding. Rights of parties cannot be determined on such a basis. The case of *Rex* v. *Cambridge* only required the examination into the qualification of one voter, and it was entertained by the Court of King's Bench, but not for that reason. *Ex parte Murphy* (7 Cow., 153) involved an inquiry as to two illegal votes, and it clearly would have been entertained, if they had influenced the result of the election. The case of *The People* v. *Cook* (14 Barb., 259; *S. C.*, 4 Seld., 67) involved an inquiry into the title of the contestant to the office of State Treasurer, and who had been voted for at a general State election. I do not find it was urged in that case that the action ought not to be entertained, on the ground of inconvenience or the great length of time which was

occupied in the investigation. The views expressed by Judge WILLARD, in this court, in the case of *The People* v. *Cook* (*supra*), are sound, and should be adhered to. He says: " We are not called upon·to say that every possible question arising under the election law may be corrected in this way. It is enough that the principle contained in *The People* v. *Ferguson* sustains the ruling of the court below. That case has stood the scrutiny of more than a quarter of a century, and has neither been disturbed by the new Constitution nor the repeated revision of the election law. I see nothing in the present case that requires us to depart from it." He adds, and what he says is as applicable to the present case as the one then under consideration: "Nor is there any danger to be apprehended to the security of our institutions by pursuing this practice. The right to an office is no higher than a right to life, liberty or property. There is no principle that should withdraw the first from the cognizance of a court and jury, to the exclusion of the last. Both will, indeed, be safe under the administration of the ordinary tribunals." We think, therefore, the charge of the judge at the circuit, that it was to be determined upon the evidence adduced which candidate had the most lawful votes, and if they found that the defendant had the greatest number of legal votes, then he was entitled to the office, and their verdict should be in his favor, was correct, and that the verdict on that ground should not be disturbed. The motion to strike out the testimony of Conrad Hoch was properly denied. It was for the jury to say, from the whole testimony, whether, in fact, his vote had been given to the relator. He stated unequivocally that he voted for Smith, and, on cross-examination, he testified that it was said Smith's name was on the ticket; that was all he knew about it. It was for the jury to say, from all the circumstances related by him, whether or not he voted for the relator. We are to assume that they believed he did. The objections taken to the refusal of the motion to strike out the testimony of Shoat cannot, we think, be sustained. The witness had testified that he did not know whether he voted or not for Smith, and the other matters stated

The People v. Pease.

by him may be regarded as wholly immaterial. The other exceptions do not seem to call for any further observation.

It seems to us that the judge was correct in stating to the jury that when it was proven that a man was alien born, and there was *prima facie* proof that he had never been naturalized, or otherwise became a citizen, the vote given by him must be striken out; and the burden of proving citizenship was either upon the voter or the party claiming his vote to be legal. If the views herein expressed are sound, then this charge was unexceptionable. So was that part of the charge correct in relation to the witness Rivinot, who testified that he was born in France, and had voted, and there was no evidence tending to show that he had ever been naturalized. The judge in that case charged that the legal presumption was that he had been naturalized. No suggestion was made or evidence given, when the witness was on the stand, that he had not been naturalized. He had voted, and the presumption was that he had voted legally. It was not for the court to say, as matter of law, that the vote was illegal. In this state of facts, the presumption was that he was a legal voter, not that he had committed a crime. On the same ground the court might have been asked, if he had stated he was native born, that his vote be excluded because it was not proven he had attained the age of twenty-one years. The legal presumption would be that he had legally exercised the privilege of voting, until some facts appeared which would raise a contrary presumption.

The judgment appealed from should be affirmed with costs.

SELDEN, J. This action, like the action of *quo warranto*, and the proceeding by information in the nature of *quo warranto*, where the defendant is in the exercise of the duties of an office, involves the question of his right to exercise those duties, and the burden of proof rests upon him to establish his right. " The trial is had upon the right of the party holding the office." (4 Cow., 323 ; Cole on Quo Warranto, 221.) Where, as in the present case, the relator is a claimant of the office, and a party to the action, the trial also involves his

right as well as the right of the defendant. (Code of Procedure, § 436 ; 2 Kern., 433 ; 16 Barb., 373.)

It appears to have been assumed, at the commencement of the trial in this case, that the defendant had a *prima facie* title to the office, and the plaintiffs took the initiative to disprove his right and establish that of the relator. The evidence produced by the plaintiffs was unquestionably sufficient, in the absence of further proof, for that purpose. According to well-settled rules, the board of canvassers erred in refusing to allow to the relator the nineteen votes given for Moses Smith, and M. M. Smith, the addition of which, to his unquestioned vote, would have given him four majority over the defendant, after adding to his vote the three votes given for D. Pease, and one for Deodate Beas; and five majority if the last mentioned vote were not counted for the defendant, about the propriety of which there might be some question. (8 Cow., 102 ; 5 Denio, 409.)

This state of facts must be decisive in favor of the plaintiffs, if the position taken in their behalf is sound, that it is not competent for the court, in trials upon *quo warranto*, to go behind the ballot box, and inquire into the qualifications of the voters whose ballots have been received.

The first ground upon which this position is attempted to be sustained is, that inspectors of elections are judicial officers, whose decisions in receiving the ballots of voters are final and conclusive.

So far as the subject has been touched upon by previous decisions, there is found little or nothing to sustain this position, and I am satisfied that it cannot be sustained. In the celebrated case, in England, of *Ashby* v. *White* (2 Lord Ray., 938 ; 1 Bro. Par. Cases, 45, 1st ed.), as finally decided by the House of Lords, officers having the powers of our inspectors of election and boards of county canvassers combined were held to act ministerially, and not judicially, in holding elections and making return of the votes.

In Buller's Nisi Prius (p. 64), it is said that an action on the case lies " for a willful misbehavior in a ministerial office

The People *v.* Pease.

by which the party is damnified, as denying a poll to one who stands candidate for an elective office (such as bridge-master), and it need not be averred in the declaration that he would have been chosen if the poll had been taken. So for refusing to take his vote at an election. So for not returning him who is duly chosen." (Referring to 1 Vent., 55; 2 Liv., 55.)

In *Jenkins* v. *Waldron* (11 John., 114), the principle is recognized that inspectors of election, in this State, are ministerial officers. The action against the inspectors in that case failed, not because the defendants were held to be judicial officers, but because it was not shown that they acted with malice. If they had acted as judicial officers, no civil action would have lain against them, even if charged with malice. (12 Co., 24; 1 Salk., 396, 397.)

In the case of the *People* v. *B. & R. Turnpike Co.* (23 Wend., 228), Cowen, J., says: "The office of inspectors is merely ministerial. On a given course of circumstances, well defined by constitution or statute, they are bound to receive or count votes and give certificates of election. They have no more discretion than a sheriff in disposing of real estate upon execution." (*Ex parte Heath*, 3 Hill, 47; *The People* v. *Seaman*, 5 Denio, 411.)

The position that inspectors of election are judicial officers, would prove too much for the plaintiffs' case. If they act judicially in receiving votes, they also act judicially in counting them, and declaring and certifying the result. If their act is conclusive in the one case, it is conclusive in the other; and the plaintiffs must rest contented with their reports, which, combined, gave the greatest number of votes to the defendant. Inspectors are required to decide some questions, but they are such as ministerial officers are often required to decide. A county clerk, before recording a deed, must decide whether it is legally proved or acknowledged, but his decision is not conclusive; a sheriff must decide whether the person whom he arrests is the person described in his process, but his decision is not judicial, and he acts at his peril. (6 Cow., 456.)

Under section 20 (1 R. S., 5th ed., 430), inspectors may be

required to decide whether the person offering his vote has or has not refused to answer fully all the questions put to him, before they can reject his vote on the ground of his refusal; under section 23, they must decide whether the voter is "a colored man" or not, before they determine what oath shall be administered to him; under section 28 (p. 431), they must decide upon the sufficiency of the record of conviction, before rejecting the vote of one challenged on the ground of his conviction of a crime, and if a pardon is produced, must pass upon the genuineness and sufficiency of the pardon; and under sections 2 and 40 (pp. 418, 433), they may be required to decide what constitutes a bet or wager on the result of the election, before receiving or rejecting the vote of one challenged under those sections. In these cases the inspectors may be required to decide important questions, and their decisions, for the purpose for which they are made, that of determining whether the votes shall be received or rejected, are final; but I do not think they are conclusive with regard to the legality of the votes when the question is presented in an action properly instituted to try the right of persons elected to office, or defeated, by the result of their decisions. They cannot call witnesses — they can receive no oral testimony excepting the oath of the voter, and no documentary evidence, unless the challenge is based on an alleged conviction of crime. The necessities of the occasion absolutely preclude any more thorough investigation, and demand an immediate and irrevocable decision. For this the law provides. In one respect the decision is final and conclusive, and that is, that the vote shall be received or rejected; but if my view of the intention of the statutes is correct, it leaves the question open for more deliberate adjudication whether the voter had or had not a right to vote. Great interests often depend upon these questions. They lie at the foundation of the government, and it is of the utmost importance that the means of detecting and exposing fraud and imposition, and correcting error, should be such as to secure the confidence of the people in the ultimate result of elections.

If, however, it be conceded that, in those special cases where express authority is given to the inspectors to receive or reject votes, they act judicially, it does not follow that their judicial power extends to other cases. It certainly does not, if they have committed to them no discretion in regard to the reception of other votes. In my opinion, they have no such discretion. With the exception of the cases to which reference has been made, viz., where the person offering his vote refuses to take the preliminary or appropriate final oath; or refuses to answer fully all the questions put to him by the inspectors; or has been convicted of bribery, or any infamous crime; or has made, or is interested in, a bet or wager on the result of the election, there is no express authority given to the inspectors to reject any vote, and I regard it as entirely clear that they have no such authority. The express authority given in those special cases would seem to exclude the idea of a general implied authority embracing all cases. The course required by the statute, to be pursued where the right of any person to vote is challenged, cannot be reconciled with any discretionary power of rejection vested in the inspectors. (1 R. S., 5th ed., p. 430, §§ 18–24.) The inspectors are, first, to administer what is called "the preliminary oath," requiring the person offering the vote to answer such questions as shall be put to him touching his place of residence and qualifications as an elector. The statute then mentions several questions which are to be addressed to him by the inspectors, and authorizes such other questions as may tend to test his qualifications as a voter. If he refuses to take the oath, or to answer fully, his vote is to be rejected; but if he answers fully, the inspectors are required to point out to him the qualifications, if any, in which he shall appear to them deficient. If he still persists in his right to vote, and the challenge is not withdrawn, the inspectors are required to administer to him the general oath, in which he states in detail, and swears that he possesses, all the qualifications which the Constitution and laws require the voter to possess. If he refuses to take the oath, his vote shall be rejected. Is not the inference irresisti-

ble, that, if he takes the oath, his vote shall be received? If his vote is to be rejected after he takes the oath, why not reject it before? As I construe the statutes, the inspectors have no discretion left to them in such a case (where the person offering the vote is not shown by a record to have been convicted of crime, or by his own oath to be interested in a bet upon the election), but must deposit the ballot in the box, whatever they may believe or know of the want of qualifications of the voter. They are required to act upon the evidence which the statute prescribes, and have no judicial power to pass upon the question of its truth or falsehood; nor can they act upon their own opinion or knowledge.

Another section of the statute strongly confirms this conclusion. That section provides as follows: "Section 36. It shall be the duty of each inspector to challenge every person offering to vote, whom *he shall know* or suspect not to be duly qualified as an elector." It is evident, from this section, that the inspector has no power to reject the vote, even when he knows the person offering it not to be a voter. His duty is discharged by requiring the voter to submit to the examination, and to take the oath which the statute prescribes.

In the second place, it is insisted, without reference to the decisions of the inspectors, that the only examination of the qualifications of the voter which is permitted, is that which is or may be made before his ballot is received.

An argument of some force in favor of this position is derived from the fact that it does not appear that the courts of this State, upon the trial of actions like the present, have ever entered upon the investigation of the qualification of voters. This argument is substantially balanced by the absence of any refusal of the courts to do so, unless in a single case at circuit which has not been reported. The absence of precedents in favor of the action against returning officers was very strongly urged in the case of *Ashby* v. *White* (*supra*), especially upon the argument in the House of Lords, but it did not prevail, and I do not think the kindred argument is entitled to much consideration in this case.

The People *v.* Pease.

The judgment, in cases of this kind, is required to be rendered "upon the right of the defendant, and also upon the rights of the party alleged to be entitled" to the office. (Code, § 436.) As was said by BRONSON, J., in the case of *Vail* (20 Wend., 16), the action "reaches beyond those evidences of title which are conclusive for every other purpose, *and inquires into and ascertains the abstract question of right.*" The greatest number of lawful votes alone gives the right to an elective office in this State; and as no adjudication can be had to determine the lawfulness of votes before they are received, that question must be open to examination by courts afterwards, or there is no power anywhere in the government to discriminate between those which are lawful and those which are unlawful. Indeed, if the rule contended for by the plaintiffs be adopted, the distinction between lawful and unlawful votes ceases to exist when they reach the ballot box. This objection is not answered by referring to the statutes requiring evidence of the right of the voter, before his vote can be received. It is only when the right to vote is challenged that any evidence is required, and there is room for great frauds to be practiced, as well to prevent challenges as to render them ineffectual when made. The only evidence required in any case is the oath of the person offering his vote, no contradiction of which is allowed, nor is there any power (if the courts do not possess it), to deny to such oath the effect of honest and truthful testimony, although every one who hears it may know it to be false and fraudulent. Neither is it an answer to say that the offender may be punished, as the government, if that were the only remedy, would have no means of defence against the direct results of such fraud. I am unwilling to believe that, in a matter of such vital importance as the choice of all its elective officers, the State is thus exposed to assault. The registry act was not in existence when the election now in question took place; but if it had been, it would not have changed the aspect of the present question. Its only effect in this respect is, to require from the voter two oaths instead of one, making the oath equally con-

clusive in each case. (Laws of 1859, ch. 380, § 5.) It furnishes additional safeguards against the commission of frauds at elections, and may aid in securing the punishment of offenders, but it furnishes no means of protecting the government against the consequences of such frauds, and therefore leaves the present question precisely where it stood before.

In England, on trials of this nature, the legality of the votes is always open to inquiry, as it certainly is in this country in suits involving the election of officers of private corporations. (Cole on Quo Warranto, 146–221; Ang. & Ames on Corporations, ch. 4, § 9; 7 Cow., 153; 19 Wend., 635.) The comparatively narrow limits within which the right of suffrage is confined in England deprive the decisions of courts in that country, upon this question, of much of the influence which would be justly due to them upon other questions; and the decisions in corporation cases are still less directly applicable to that under consideration. Those cases, however, show that where the right to an office is in controversy, it is not, as a general rule, conclusively determined by the number of votes which the claimant may have received, but the further question, whether the votes were legal, is open for consideration. Without deciding that question when it is presented, judgment cannot be rendered "upon the right" of the parties as the statute requires. (Code, § 436.)

In contests in regard to elections to Congress, the legality of the votes, as well as their number, has always been a subject of inquiry (Cushing on the Law and Practice of Legislative Assemblies, § 198); and "I think a court and jury, with better means of arriving at truth, may pursue the same course." (20 Wend., 14.)

The inconvenience which it is supposed may arise in the trial of such questions, from the great number of witnesses which may be required, especially in trials relating to State officers, has been relied upon as a reason why it should not be held that courts can pass behind the ballot boxes, and try and determine the qualifications of the voters whose votes may have been received or rejected. This argument is certainly not

without force, as cases may readily be imagined where any-thing entitled to the name of a trial of the legitimate issues which such an action might present would be literally impos-sible; but believing, as I do, that the statutes have unques-tionably left this duty to the courts, no inconvenience which could be anticipated would justify courts in declining to dis-charge that duty as far as possible. The past experience of the government has not been such as to induce the court to pay very much heed to this argument from inconvenience. So far as the books of reports show, there has been no case in the State, prior to this, where any such question has been pre-sented, and this does not appear to have involved such a num-ber of issues, or required the examination of such a number of witnesses, as to render the prospect of such trials alarming. But if this were otherwise, the remedy would belong to the legislature and not to the courts. A rule of pleading requir-ing the parties to specify the votes objected to, and the grounds of objection, or a rule of practice requiring an exchange of notices to the same effect, and the limitation of the parties in their proof to the cases and grounds so specified, as is the practice in England in regard to contested parliamentary elec-tions, would go far to remove the difficulty if it should be found to exist. (Roe on the Law of Elections, part 3, ch. 4.) A similar practice is adopted where elections to Congress are contested. (9 Stat. at Large, 568, § 1; Brightley's Dig., 254, § 14, and note a.)

My conclusion, therefore, is, that the judge decided correctly at the trial, that evidence was admissible to show that votes received and counted for either of the parties were given by persons who were not qualified electors.

There was no error in the ruling of the judge, that voters might be asked the question for whom they voted. The only grounds of the objection appear to have been, that under our system of elections, which allows, indeed requires, the secret ballot, (1 R. S., 5th ed., 426, § 7,) it is not proper to compel a voter to disclose for whom he voted; and that where the object is to show that he voted illegally, and was, therefore,

possibly guilty of a misdemeanor, he should not be required to give evidence tending to establish his guilt. It is a sufficient answer to these objections, that they are available only to the witness, and not to the party. In regard to the last ground, there is the further answer (the witness having admitted that he voted), that an answer to the question, for whom he ·voted, could have no bearing upon his guilt or innocence.

The objections to the order in which the proof of the facts should be introduced, involved the exercise of discretion merely, on the part of the judge, which is not, in such cases, reviewable on appeal.

When a voter refuses to disclose, or fails to remember, for whom he voted, I think it is competent to resort to circumstantial evidence, to raise a presumption in regard to that fact. Such is the established rule in election cases before legislative committees, which assume to be governed by the legal rules of evidence (Cushing's Law and Practice of Legislative Assemblies, §§ 199, 210); and within that rule it was proper, in connection with the other circumstances stated by the witness, Loftis, to ask him for whom he intended to vote; not, however, on the ground that his intention, as an independent fact, could be material, but on the ground that it was a circumstance tending to raise a presumption for whom he did vote. The refusal to strike out the testimony of Conrad Hoch involved the same principle.

The poll lists of New Bremen and Croghan were rightfully admitted. The only fact in regard to them which was requisite to be established to authorize their admission as evidence appears to have been undisputed, viz., that they were the poll lists of these towns or districts, kept at the election in question. The provisions of the statute relative to such lists must be regarded, mainly, as directory only (14 Barb., 290, 291; 4 Seld., 89); and any failure to comply with such provisions, if lists were actually kept, would not justify their rejection, when offered in evidence. There does not appear, however, to have been any material departure from the directions of the statute in keeping the lists. Neither a heading to

The People *v.* Pease.

show what the paper was, nor the signatures of inspectors or clerks, was required. (1 R. S., 5th ed., 432, § 34; 436, § 57.) The anterior filing of one of the lists was of no moment, so long as its genuineness was unquestioned. What the lists proved or failed to prove, could not be considered in deciding the question of their admissibility.

There was sufficient evidence offered by the defendant to justify the refusal of the ruling, asked for by the plaintiffs' counsel, "that no proof had been given to go to the jury sufficient to overcome the five majority conceded to the relator," of the votes given. The judge could not be understood as ruling that the proof was sufficient to overcome the majority, but only that it was sufficient to be submitted to the jury for their consideration as to its effect.

The refusal to allow the examination of the witness, McRea, in reply to the defendant's proof, under the circumstances disclosed in the case, presented only an exercise of discretion on the part of the judge, which ought not to be reviewed here. If there had been no arrangement made on the subject at the close of the plaintiff's opening testimony, the evidence offered would have been admissible in reply, as a matter of right, and its rejection would have furnished good ground for a new trial. But the express reservation, with the approbation of the court, of the right to call (at the close of the defendant's testimony, as I understand the arrangement) certain witnesses who were named, "for the purpose of showing that illegal votes had been cast at said election for the defendant," might properly be regarded as restricting the plaintiff to those witnesses only, in reply on that subject, although the facts offered to be proved would have been proper in reply, and might have been proved by any witnesses, if no arrangement had been made. It is apparent that the course attempted to be pursued by the plaintiffs might, if allowed, have operated as a surprise upon the defendant. The judge, in whose presence the arrangement was made, was much better qualified to decide, whether it was likely to do so, than this court can be.

The arrangement had the effect to change, what otherwise would have been a question of right, into one of discretion.

The two first exceptions to the charge present only the question, already considered, whether the qualifications of the voters could be inquired into on the trial, and, therefore, require no further notice.

The charge in relation to the change of residence of Bellinger, was too clearly correct to require comment. (4 Cow., 516, note 2; Westlake on Private International Law, 36.)

No doubt can arise in regard to the correctness of the charge, that where it was proved that a voter was alien born, and there was *prima facie* evidence that he had not become a citizen by naturalization or otherwise, the vote given by him must be rejected, unless proof of his citizenship was produced.

The refusal to charge in the case of Rivinot, that if the jury found that he was an alien born, then, in the absence of any proof of naturalization, his vote must be disallowed; and the charge, that in such case the legal presumption was that he had been naturalized, presents a question of greater difficulty. As a general rule affirmative facts are not to be presumed, but must be proved by the party asserting them. There are, however, some exceptions to this rule, and the question presented by this part of the charge is, whether the case falls within any of those exceptions. I am of opinion that it does, and that the charge was correct.

Greenleaf, in his work on Evidence, says: "Where the negative allegation involves a charge of criminal neglect of duty, whether official or otherwise, *or fraud*, or the wrongful violation of actual lawful possession of property, the party making the allegation must prove it; for in these cases the presumption of law, which is always in favor of innocence and quiet possession, is in favor of the party charged." (1 Greenleaf on Ev., § 80.) The request to charge in this case involved, on the part of Rivinot, something more than a criminal neglect of duty, or fraud. If he voted without naturalization, the act constituted a misdemeanor. (1 R. S., 5th ed., 449, § 13.) The presumption against positive crime cannot be less strong

than the presumption against fraud or criminal neglect of duty. The negative, therefore, which was involved in the plaintiffs' request, could not be presumed, but required to be proved by the party alleging it. (*Williams* v. *East India Co.*, 3 East., 192, 199; *King* v. *Hawkins*, 10 Id., 216; *Powel* v. *Milbank*, 2 W. Bl., 851.)

I can perceive no difference between the present case and one where the right to vote depends on residence. In the case of the *Commonwealth* v. *Bradford* (9 Metc., 268), the defendant was indicted and convicted for voting at the general election in Boston on the 11th of November, 1844, when, as was alleged, he was not a qualified voter, not having resided in Boston the six months next preceding that election. It was proved that the defendant resided at Kingston until about the first of April, 1844, when he went to Boston, and entered into partnership there with the express understanding that he should make that place his residence: that he continued in Boston until the election, with occasional returns to Kingston, where his family remained until a short time before the election, when they removed to Boston. There was conflicting evidence as to his declarations and intentions respecting his domicil. The judge, at the trial, charged the jury that, as "the defendant's domicil was at Kingston, until he acquired one in the city of Boston, the burden of proof was upon him to satisfy the jury affirmatively, and beyond a reasonable doubt, that on the 11th day of May, 1844, he had changed his domicil from Kingston to Boston, and then dwelt and had his home in that city." Chief Justice SHAW, in delivering the opinion of the Supreme Court upon this point, said: "The court are of opinion that this direction was wrong, and that the burden of proof was still on the government, to prove that the defendant had no right to vote, and that he had not been an inhabitant of the city six months. This, it is true, is a negative proposition, difficult to prove, *but necessary in order to charge a party with a criminal offence.*" On that ground the conviction was set aside. In such cases the presumption in favor of innocence overcomes the presumption, which would

otherwise arise, of the non-existence of the fact not proved. To rebut such counter and stronger presumption, some positive evidence to establish the negative is necessary. What that should be, must depend on the nature of the case. (*Calder* v. *Rutherford*, 3 B. & B., 302; Phil. Ev., C. & H. ed., 196.) The negative in regard to naturalization would ordinarily be much more difficult to prove than it would be in regard to residence, but the principle of both cases is the same. (*Rex* v. *Rogers*, 2 Campb., 654; *Rex* v. *Twyning*, 1 B. & A., 386; *Hicks* v. *Martin*, 9 Mar. [1 Louis.], 47; 1 Cow. & Hill's Notes, n. 325, p. 423.) Full and conclusive proof, where a party has the burden of proving a negative, is not required, but even vague proof, or such as renders the existence of the negative probable, is, in some cases, sufficient to change the burden to the other party. (*Calder* v. *Rutherford*, *supra*.) The last request of the plaintiffs' counsel was, therefore, properly overruled.

The judgment of the Supreme Court should be affirmed.

EMOTT, ROSEKRANS, and BALCOM, Js., concurred.

DENIO, Ch. J. (dissenting.) The circumstance that the plaintiff had to make out his title to the office by claiming the allowance in his favor of ballots in some respects imperfect, and which had not been allowed him by the canvassers, has no proper influence upon the main question involved in the case. If the plaintiff had received an undisputed majority of all the votes given, and had obtained the adjudication of the board of county canvassers in his favor, and had been prosecuted in such an action as this by the present defendant, the same precise question now under consideration would have arisen. That question is whether a candidate, who is found in a minority upon a correct estimate of the ballots actually deposited according to law, can, notwithstanding, claim and obtain the office, by showing that a number of the votes of the opposing candidate, sufficient to have changed the result, were cast by persons not qualified to vote. It is a very

important practical question; for where the constituency is as numerous as it must always be where universal suffrage prevails, it can rarely happen, in an election even for a local office, that reasonable doubts may not arise as to the qualifications of a greater or less number of voters for the one candidate or the other. Hence, where the majority disclosed by the ballots is small, the strongest temptation will be held out to the defeated party to institute a scrutiny, of the character resorted to in this case, into the qualification of the persons whom he supposes to have voted for his opponent. The successful candidate will, of course, have an equal right to scrutinize his opponent's vote, and thus his right to the office will depend, not upon the official determination of the canvass, but upon the trial of an issue involving a great number of distinct questions of fact, entailing great expense to the parties and much inconvenience to the public, on account of the delay and the uncertainty, which must in the meantime prevail, as to the legal incumbency of the office. It is a plausible proposition, and in one sense a true one, to say that the right to an elective office ought to depend rather upon the number of legal votes given to the respective candidates, than upon the absolute number. But the position does by no means solve the difficulty presented by this case. The real question is who, according to the arrangements which the constitution and laws have provided for determining that question, received the greatest number of votes, and was elected to the office. If the law has left it as an open question, to be determined like ordinary matters upon which private rights depend, or, which is much the same thing, if the certificate of the canvassers is made only *prima facie* evidence of the state of the poll, as is argued, the right can only be definitely settled by the verdict of a jury. But the nature of the subject would lead us to conclude, *a priori*, that such could not be the system organized by the legislature. Nothing, in all the arrangements of civil government, can be more important than that the various official posts should be at all times occupied by magistrates not only lawfully chosen, but about whose title to their respective posi-

tions in the public administration there should be neither doubt nor uncertainty. The quiet and order of society and the due execution of the laws require that such should be the case. A person coming into an office under color of a legal election, no doubt has certain of the characteristics of a public officer; but common observation and experience show that, without an assured title to the office, the officer is not fully respected and obeyed, and is unable to accomplish the public objects which were intended to be secured by the creation of the office. If his title eventually proves defective, his right as an officer *de facto* will not protect him against the actions of individuals whose persons and property have been affected by his assumed official acts.

I am of opinion that the policy of the legal provisions which have been enacted upon this subject is to secure record evidence of the result of the election, which, save in a few exceptional cases to be presently mentioned, is conclusive upon the public and upon all individuals, and against the verity of which no allegation can be admitted. I do not proceed upon one of the grounds relied upon by the plaintiffs' counsel, namely, that the inspectors of elections are made judges of the qualifications of persons claiming to be elected and who may offer to vote. The statute declares that when the right to vote is challenged, the party desiring to vote is to be sworn to answer such questions as shall be put to him touching his residence and his qualifications. If he refuses to be so sworn, or to answer fully, after he has been sworn, his vote is to be rejected. This is not a determination of the inspectors as to his qualifications; but he is put aside for refusing to comply with the terms prescribed by law. If he consents to be sworn and to answer, he is to be interrogated upon the various points involved in the question of due qualification. If, in the judgment of the inspectors, his answers have shown that he is deficient in any requisite, that is to be pointed out to him. If he persists in his claim to vote, and the challenge is not withdrawn, the inspectors are obliged to administer to him the general oath, in which he affirms the possession in

himself of all the qualifications.  If he refuses to swear to this, his vote is to be rejected.  But if he takes the oath, the inspectors have no discretion or judgment to exercise, but must receive his ballot.  This is the effect and nearly the language of the statute.  (1 R. S., 430, §§ 19–24.)  There is a section in the election act of 1847, which seems, at a first view, to be adverse to this construction.  It declares that, in case any inspector of an election shall knowingly or willfully permit· or suffer any person to vote at an election, who is not entitled to vote thereat, the said inspector so offending shall, on conviction thereof, be adjudged guilty of a misdemeanor. (Ch. 240, § 16.)  But this penalty may be incurred consistently with the provisions which have been referred to.  For instance, if any inspector should receive the vote of one whom he knew was not qualified, without tendering him the general oath, or should allow him to vote although he refused to take the oath, he would undoubtedly violate the provisions of the section. But if the inspector performs his duty by tendering and administering both oaths, the voter does not deposit his ballot by the permission or sufferance of the inspectors, in any legal sense, but by the provisions of the act.

But while I disclaim any reliance upon the alleged judicial character of the inspectors, I am still of opinion that, so far as the value of the vote is concerned, the voter is made a competent and an effectual witness respecting his qualifications to vote.  Should he swear falsely, he is liable to indictment and punishment for perjury; and the act directs the preservation of so much of the evidence of his having voted as shall be necessary to establish the fact upon the trial of an indictment. The inspectors are to make and file a minute of the names of the persons who take the oaths or either of them, and the clerks are to distinguish the names of such voters by an appropriate mark against them on the poll list, which list is to be filed after the canvass is completed. (1 R. S., p. 431, § 27; p. 436, § 57.)  But, necessarily, there cannot be any written evidence preserved of the name contained on the voter's ballot, for it is of the essence of this manner of voting that the

elector may conceal from every person the name of the candidate for whom he votes. In furtherance of this policy, and as if it were to provide effectually against the possibility of investigating that question, all the ballots, except one of each variety, which are to be annexed to the statement, are, at the close of the canvass, to be destroyed. (Id., § 58.) If they were preserved and placed on file like the poll list, in many cases, especially where they were written by the voter, or were secretly marked by him, or an inspector or clerk, as might readily be done, the means of determining the candidate voted for would be considerably increased. The directions to destroy the mass of the ballots affords some evidence that the legislature did not contemplate that such an inquiry could ever be entertained.

The position, that the right of suffrage is to be conclusively determined by the voter's oath, may, at first, appear unreasonable, as it may be said that he is an interested party. But the interest is not of a pecuniary nature, which would be more likely than any other to have a corrupting influence, nor of a kind calculated to operate very strongly upon the mind of any one. Many matters in the administration of justice, or the course of public business, are determined by the *ex parte* affidavit of the parties concerned, and we do not now consider it dangerous for parties to be witnesses in their own causes, however large an amount may be involved. It would be quite impossible to subject each claim to the privilege of voting to a forensic trial and determination. The form of the scrutiny must necessarily be brief and summary. Voters may swear falsely or mistakenly, and doubtless this is sometimes done. It is not often that the result of an election will depend upon the ballots of such voters; but admitting that it will in rare instances happen that a candidate having only a minority of legal votes will be declared chosen, still this evil would be infinitely less than the establishment of a rule which should declare that nothing should be considered determined, except *prima facie,* by the official canvass, and that the unsuccessful

candidate might, through a *quo warranto* prosecution, try the qualifications of the voters in a suit at law.

I have already alluded to the policy of the law providing for a secret ballot. The right to vote in this manner has usually been considered an important and valuable safeguard of the independence of the humble citizen against the influence which wealth and station might be supposed to exercise. This object would be accomplished but very imperfectly, if the privacy supposed to be secured was limited to the moment of depositing the ballot. The spirit of the system requires that the elector should be secured then, and at all times thereafter, against reproach or animadversion, or any other prejudice, on account of having voted according to his own unbiased judgment; and that security is made to consist in shutting up within the privacy of his own mind all knowledge of the manner in which he has bestowed his suffrage. If this were the only argument against the *post factum* judicial scrutiny into the qualifications of the voter which the defendant claims, I should consider it quite sufficient to show that no such scrutiny was allowable; for surely the law cannot be so inconsistent with itself as to authorize a judicial inquiry upon a particular subject, and at the same time industriously provide for the concealment of the only material facts upon which the result of such an inquiry must depend.

A single other suggestion in answer to those who insist that the law could never intend to commit to the persons offering to vote, the right of determining their qualifications conclusively by their own oath, will conclude the observations which I have to make on this part of the case. Absolute perfection cannot be predicated of any of the arrangements of government, with whatever human sagacity and wisdom they may be contrived. All that legislators can do is to devise what shall seem to them the best practical scheme to accomplish a given object of which the subject is capable. The public offices must be filled with incumbents, that the public administration may not suffer, and these incumbents must, according to our system, be selected, for the most part, by universal

suffrage. To the generally universal right to vote there are certain necessary limitations, such as citizenship, proper age and residence. The problem for the legislature was to provide for the ascertainment of these qualifications in the case of each voter. The legislature was charged with this duty in the clause declaring that "laws shall be made for ascertaining by proper proofs the citizens who shall be entitled to the right of suffrage," thereby established. (Art. 2, § 4.) The first question no doubt would be at what time this determination should be made—before the vote is given, or after the election, and after the party *prima facie* chosen had entered upon the duties of the office. The provisions for challenging and swearing the voter indicate, certainly, to a general intent, that it was to be made before the voting, and the manifest convenience of such a course would confirm, if necessary, that conclusion. This is the plain meaning of the constitutional provision; for it would be absurd for a law to provide for a determination of the right to vote after the vote had been given and the election had passed. The next subject to be considered would be as to the method of determining it. Upon this point, the legislature considered that if one claiming to be a voter came forward, openly and publicly, before the inspectors and the public, who would be likely to be his neighbors and acquaintances, and offered to vote and no one questioned his right, or swore positively to his qualifications if challenged, it would be quite safe to assume that he possessed the requisite qualifications; for the inspectors and the whole community would not be likely to conspire in the interest of illegal voting. The law, therefore, provided that in such a case the vote should be received without other evidence. As to those whose right should be challenged, the legislative will was that the voter should be questioned on oath by the inspectors; that if doubts as to his right should be entertained, these doubts should be stated to him and the law explained, and that then it should be left to his conscience whether to affirm upon his oath, under the peril of temporal punishment for perjury, and of such religious and moral responsibility as might affect his mind, or to abstain

The People *v.* Pease.

from voting. This was the legal system provided by the legislature in obedience to the mandate of the Constitution, and the one which was in existence when the election in question was held. No doubt the determination of the right is left to depend essentially upon the voter's oath, and that there is a possibility that a false or mistaken oath may sometimes be taken. But is the hazard of a perversion of the franchise, under these arrangements, so great as to require us to hold, against the plain language of the statute, that a right is implied to reëxamine the question before a jury, in case the right of the prevailing candidate shall afterwards be called in question? I think not. One has only to read the testimony given on the trial of this case to see that the summary scrutiny at the polls, depending, as it necessarily must, ultimately, upon the voter's oath, is immeasurably more conducive to an accurate result than any verdict a jury can render upon such a trial. Out of nineteen witnesses who were interrogated as to whom they voted for, for county treasurer, in order to show that they voted for Smith, the plaintiff, six declared that they voted for him, and thirteen could not remember for whom they voted. Several testified that they did not vote at all, who were shown to have voted by the production of the poll lists. Equal uncertainty prevailed as to the alleged disqualification on account of alienage of those who were shown to have been the plaintiff's voters; for questions of law were there mixed up with questions of fact. The difficulties of arriving at the truth in this particular case were probably not greater than those which would generally occur upon such an inquiry conducted at a considerable distance of time from the election, and where the alleged voters whose right was denied were unlettered and ignorant men.

My conclusion, as has already been intimated, is that the law does not contemplate or allow the right of an elector to be questioned judicially or otherwise, after the election has taken place and the result has been declared according to law. I am strongly impressed with the belief that such a construc-

tion of the statute would be inconvenient and even mischievous in its tendency, and that its allowance would be intolerable in practice. I would not impute to the legislature an intention to provide such a system, without the clearest indications appearing in the language of the statute; and I am unable to see any evidence of such a design.

A good deal of reliance, on the part of those who differ from the foregoing conclusion, has been naturally placed upon certain decisions of this court, in which it has been held that on the trial of an information or an action in the nature of a *quo warranto*, extrinsic evidence may be received to show that ballots not allowed to a candidate in the official canvass, and in which his name was not accurately written or printed, were actually intended for him, and they have been estimated and allowed accordingly in the determination of the title to the office. We have, however, recently held that it is only the intention of the voter, as expressed by the ballot, interpreted, if necessary, as all written evidence may be; by proof of the concomitant circumstances, which can be taken into consideration on the trial. If the elector who deposited the vote should swear ever so strongly, that he intended it to be for a particular candidate, it could not be allowed to him, unless it appeared, upon the other competent evidence, that his name was actually written or printed upon it. (*The People* v. *Saxton*, 22 N. Y., 309; and see also *The People* v. *Seaman*, 5 Denio, 409.)

I have examined attentively the several cases in which it has been held that, in a suit in the nature of a *quo warranto* information, the court were entitled to receive evidence in addition to the documents authenticated by the town and county officers concerned in conducting the elections and the canvassing of the votes. (*The People* v. *Van Slyck*, 4 Cow., 297; *Ex parte Murphy*, 7 Id., 153; *The People* v. *Ferguson*, 8 Cow., 102; *The People* v. *James*, 19 Wend., 81; *The Same* v. *Vail*, 20 Id., 12; *The Same* v. *The Rensselaer Turnpike*, 23 Id., 222; *The Same* v. *Heath*, 3 Hill, 42–47; *The People* v. *Seaman*, 5 Denio, 409.) None of those cases, I think, afford the slightest countenance to the position that the qualifications of

voters who have deposited their ballots can be subsequently examined. These cases may be arranged into two classes: those in which some error or omission of a clerical nature had occurred in the returns or statements which the election officers are required to make, as in *The People* v. *Van Slyck* and *The People* v. *Vail;* and those in which one of the parties had been defeated by the failure to allow votes intended for him, but in which his first name had been written with initials only, or was in some other respects imperfectly written. *The People* v. *Ferguson* (8 Cow., 102, decided in 1827), was the first of this class. All that was necessarily decided was that votes for H. N. Yates ought to be allowed for Henry N. Yates, on proof that these initials were used by Henry N. Yates, and that no other person of that family name was voted for for the office. Chief Justice SAVAGE, in preparing the opinion of the court, went somewhat further than was necessary, or can now be sustained. He was of opinion that a voter was competent to testify for whom his vote was *intended*, which, as has been stated, has been reconsidered by this court; but the case in other respects, and in its main feature, has been steadily followed from that time to the present, and is now the undoubted law of the state. (See *The People* v. *Seaman, supra*; *The People* v. *Cook*, 4 Seld., 67; *S. C.*, 14 Barb., 259.) The same kind of evidence was received in the case before us, and, as has been mentioned, its competency was not disputed on the argument. It was, no doubt, a very liberal construction of the election law, which enabled this court, in the first of these cases, to act upon evidence which the officers concerned in authenticating the results of an election were not authorized to receive. But the justice of the case was so manifest that it is not surprising that the matter of form was dispensed with and the clear intention of a majority of the electors was allowed to prevail. The legislature, I conceive, at least impliedly, acquiesced. As the election law originally stood, the inspectors were directed, immediately after completing the town canvass, to destroy all the poll lists and ballots made and taken at the election. (Laws 1822, p. 273, § 9.) The Revised Statutes contained this direction, except

as to ballots rejected as imperfect, which were to be preserved and filed with the town clerk. (1 R. S., 138, §§ 51, 52.) It was about the time of the preparation of this chapter that the case of *The People* v. *Ferguson* was decided. It was perhaps supposed that all ballots in which the name of the candidate was not accurately written would fall under the denomination of imperfect ballots. But a ballot might be intrinsically perfect, in which the name of the person intended to be voted for was not accurately written. Hence, in the next election law the inspectors were directed to attach to their statements one ballot of each kind found to have been given for the officers chosen at such election, or any or either of them. They were also, as in the former law, to attach to the same statements the defective ballots. The statements and the poll lists were to be filed in the town clerk's office, but the remaining ballots not so attached to the statement were to be destroyed. (Laws 1842, p. 1223, §§ 42, 45–47.) These provisions are still in force and governed the election of 1857 in question in this case. It will be seen that the legislature finally co-operated with the courts in carrying out the principle of the cases referred to; but it is evident from their persisting in requiring all the ballots except a sample one of each kind, to be destroyed, that they had no idea of encouraging a scrutiny as to the qualifications of electors who had given their votes, by preserving evidence by means of which such scrutiny might be prosecuted.

The foregoing considerations have led me to the conclusion that the judgment of the Supreme Court ought to be reversed and a new trial awarded.

WRIGHT and MARVIN, Js., also dissented.

Judgment affirmed.