The People *ex rel.* Judson and Judson, appellants, v. Thacher.

*Election — fraudulent return by inspectors — when return not evidence.*

In an election in the city of Albany, at which relator, defendant, and one McCarty were candidates, relator had a majority over defendant in the whole district, except the fourth ward, of 146. In the fourth ward there were 729 votes actually cast for the office, but while the inspectors were engaged in counting, the lights went out, and when relighted it was found that there were but 652 ballots left upon the table. Of these 460 were for defendant, 113 for relator, and 79 for McCarty. The inspectors made up their certificate according to these last figures, showing a total of but 652 votes, and upon the strength of the certificate defendant received the office. This action having been brought, parol evidence was given on the trial, tending to show that in that ward 200 votes had been cast for relator, and 184 for McCarty.

*Held*, per P. Potter and Parker, JJ. (Miller, P. J., *contra*), that it was error to charge that, "You are to find whether fraud was committed. I do not speak of the misconduct of outside parties, but you are to examine and see whether intentional fraud was committed by the inspectors. I can see nothing else than the intentional fraud of the inspectors which would justify you in entirely setting aside the canvass. It must be a conviction in your minds that there was intentional fraud on the part of the inspectors, and such fraud as altered the result, that is necessary in order to set aside the entire return." And that it was error to refuse to charge this : "If the jury believe from the evidence that, preceding and during the canvass of the mayor's box, ballots for mayor were either illegally abstracted from the box or table, or placed in the box or on the table, and it is entirely uncertain to what extent this was done, then the returns should be rejected, and each candidate credited with the votes otherwise proved to have been cast for him, although none of the inspectors were concerned in the transaction."

Per Parker, J. That it was error to charge thus : "I see no reason why you should deduct the number of votes proved to have been cast for Judson and McCarty from the smaller number of votes canvassed, and not from the larger number of votes cast at that poll. Per P. Potter, J. That the certifi

cate being concededly false as to the total number of votes cast, was not even evidence to go to the jury.

APPEAL by plaintiff from a judgment for defendant entered upon the verdict of a jury, and from an order denying a new trial. The case being this.

The action was brought to oust defendant from the office of mayor of the city of Albany, and to put relator in his place. Judson, Thacher and one McCarty were candidates for that office at the charter election in 1872. In the whole city except the fourth ward Judson received 146 majority over Thacher. In the fourth ward it was shown by the poll list, and was conceded, that there were in fact 729 votes cast for the office of mayor. When the inspectors had emptied the ballots upon the table, and were proceeding to count them, while several persons were standing around, the gas suddenly went out. Candles were procured and the inspectors continued to count the ballots, and it was found that there were 652, as follows:

For *Thacher* .......................................... 460
  "  *Judson* ............................................. 113
  "  *McCarty* ........................................... 79

      Total ........................................... 652

The inspectors made up their certificate according to these last figures, and *Thacher* received the office.

Upon the trial parol evidence was given, tending to show that in that ward there had been cast 200 votes for *Judson* and 134 for *McCarty*.

Defendant had a verdict, and plaintiffs moved for a new trial, which was denied. The questions in the case arise upon portions of the charge quoted in the opinions.

*L. Tremain*, for appellants.

*M. Hale*, for respondents.

PARKER, J. This is an action commenced by the People upon the relation of Emund L. Judson, and by the said Judson against the defendant, in the nature of a *quo warranto*, to try the title to the office of mayor of the city of Albany.

The action was tried at an adjourned circuit in Albany, in September, 1873, and resulted in a verdict for the defendant.

A motion was made for a new trial upon the minutes of the judge who tried the cause, which was denied. Judgment in accordance with the verdict was entered, and from such judgment, and the order denying plaintiffs' motion for a new trial, the plaintiffs appeal to the general term.

The plaintiffs ask a reversal of the judgment and a new trial, both upon the facts, and upon exceptions to errors of law alleged to have been committed upon the trial.

The certificate of election was given to the defendant. This, *prima facie*, entitles him to the office; but it is open to proof that the official canvass and certificate were not correct, and that the person so certified was not in fact elected to the office. *The People* v. *Cook*, 8 N. Y. 67.

Without going at much length into the evidence, it must suffice to state that the controversy in regard to the correctness of the canvass is confined to that in the southern district of the fourth ward. In that district 729 votes were given for mayor, according to the poll-list. While the votes were being counted, by gas-light (having been turned from the box upon a table), the light suddenly went out, and before the gas was relighted, it is alleged by the plaintiff that the ballots upon the table were interfered with by some person or persons, and some of them abstracted, and votes for Thacher substituted. Evidence was given tending to show that such was the case. It turned out that upon counting the ballots upon the table, after the gas was relighted, there were only 652 for mayor, of which 460 were returned for Thacher, 114 for Judson and 79 for McCarty, being in all less by seventy-seven than had been put into the box for mayor, according to the poll-lists.

Evidence was given, by the testimony of voters themselves, tending to show that 200 voters voted for Judson for mayor in this district, and 134 for McCarty. Deducting the sum of these from 652, there are left only 318 for Thacher, making his majority in this district, according to the returns thus corrected, 118.

Judson received a majority in the residue of the city, outside of this district, of 146. If Thacher's majority in this district was only 118, it follows that Judson was elected mayor by 28 majority. But if the 334 votes for Judson and McCarty in this district are to be deducted from the whole number of votes cast for mayor,

shown by the poll-lists, 729, there are left 395 for Thacher (if they are all to be counted for him) making a majority of 195 over Judson in the district, electing Thacher mayor by 49 majority.

In charging the jury the court say: "I see no reason why you should deduct the number of votes proved to have been cast for Judson and McCarty from the *smaller* number of votes *canvassed*, and not from the *larger* number of votes cast at that poll." This was excepted to by plaintiffs' counsel, and it appears to me that the plaintiffs' position, that it was erroneous, is correct.

The *canvass* of the inspectors is to be taken as *prima facie* correct; but when we get beyond the canvass, which gives 652 as the number of votes cast at that poll for mayor, we are beyond the range of such *prima facie* evidence of correctness. The canvass does not show that the 77 votes, not included in it, were given for Thacher.

It says: The whole number of votes for the office of mayor was 652, *of which*

George H. Thacher received ............................. 460
Edmund L. Judson received ............................. 113
Thomas McCarty received................................. 79
                                                        ———
                                                        652

It is this return that is corrected by proof that Judson received 200 and McCarty 134. For whom the 77 other votes were cast, does not appear from the return. So that Thacher is not *prima facie* entitled to them.

Doubtless if there is evidence on the subject, the court might have left to the jury the question whether the 77 votes were cast for Thacher, and instructed them, if they found they were, that they should deduct the 334 votes from the whole number of 729. But these 77 votes were not shown by the returns to have been given for Thacher, and the court was wrong in assuming, as the charge did, that they were given for him.

The court charged the jury on the subject of fraud upon the ballot-box, whereby the result was changed, as follows: "You are to find whether fraud was committed. I do not speak of the misconduct of outside parties, but you are to examine and see whether intentional fraud was committed by the inspectors. I can see nothing else than the intentional fraud of the inspectors which

would justify you in entirely setting aside the canvass. It must be a conviction in your minds that there was intentional fraud on the part of the inspectors, and such fraud has altered the result, that is necessary in order to set aside the entire return." To this plaintiffs' counsel excepted. Plaintiffs' counsel requested the court to charge as follows, viz.: " If the jury believe, from the evidence, that preceding or during the the canvass of the mayor's box, ballots for mayor were either illegally abstracted from the box or table, or placed in the box or on the table, and it is entirely uncertain to what extent this was done, then the returns should be rejected, and each candidate credited with the votes otherwise proved to have been cast for him, although none of the inspectors were concerned in the transaction."

This was refused, and the refusal excepted to, and I think sufficiently excepted to, although defendant's counsel makes the point that it was not.

Both of the exceptions last mentioned relate to the same alleged error of the judge in holding that no fraud upon the ballot-box committed by any one except the inspectors could avail to set aside the return entirely, and throw the parties upon other proof of their votes in that district.

I think the holding was wrong in principle, and wrong as applied to this case. There is evidence to make it a proper inquiry for the jury whether, during the interval between the going out of the gas and its being relighted, ballots were not taken from the table and others placed upon it, by persons other than the inspectors, and without their complicity. If this was done, so that the result of the voting at the poll was rendered entirely uncertain, it was sufficient cause, I think, for setting aside the return.

Without pursuing the inquiry upon the questions raised in the case, the errors committed as above stated are sufficient to entitle the plaintiffs to a reversal of the judgment and order, and a new trial, which should be ordered, with costs to abide the result.

P. POTTER, J. The mass of evidence contained in this voluminous case was hardly referred to upon the argument, and becomes nearly useless upon this review. The decision will mainly depend upon a state of undisputed facts, conceded upon the argument, or taken from the charge of the learned judge to the jury. The action is to try the title to the office of mayor of the city of Albany. It

is a question which, though instituted in the name of the people, is really to settle a right between the relator and the defendant, as individuals. The legal title to this office depends upon ascertaining the truthful expression of the popular will of the electors of the city of Albany. Such an action as this is a proceeding peculiarly appropriate, and especially adapted to try the question of title to an office. It allows the parties to look beyond the mere prescribed forms, by which results are, in the first instance, to be ascertained, and allows the actual will of the electors to be shown. It does not exclude the oral proof by the electors, of their expression of choice, nor allow their will to be defeated, either through prescribed forms of law, or through the negligence, mistake or fraud of those who are appointed to register the results of an election; nor even the frauds of others which may defeat or destroy the expression of the sovereign will.

The right to hold an office is a sacred right, derived from the highest source of political power known to our form of government. It is a right secured by the popular voice expressed in the forms of popular sovereignty. The trial of such an issue at law is an inquiry into that right. It is, like other issues, to be determined by established rules of evidence which are intended for the establishment of truth, and its investigation is not shackled by or confined to forms alone. At common law, where, as in this case, the people are a party, the certificate of the board of inspectors is, first, *prima facie* evidence of the truth of *such* statements as they are permitted or directed to certify. But it is only *prima facie* evidence; it is not conclusive; and, like all other merely presumptive evidence, it is subject to be overcome or destroyed by better, higher or more certain evidence, and may be entirely so overcome or impeached. In this country, it is the actual expressed will of the electors, not the certificate of the inspectors, that confers the title to an office. It is *truth*, not *form*, that confers the right. *People* v. *Cook*, 8 N. Y. 67. What is sufficient to impeach the presumption created by an inspector's certificate; how long it continues to have legal vitality; how long the *onus probandi* remains with the relator, are, perhaps, the most important legal questions arising in this case. From the charge of the learned judge, as well as from concessions made on the argument, the whole controversy is limited to the votes cast by the electors in the southern district of the fourth ward of the city of Albany.

Excluding that district in estimating the result, it was conceded

that the relator had a majority of 146 votes for the office of mayor, from the aggregate vote of all the other districts in the city. Taking the certificate of the inspectors of election of that district as evidence of the result, the defendant would be elected by a majority of 201 votes. This statement embraces the whole scope of the controversy, so far as it is here for review. If then, by legal evidence, or by admissions made upon the trial, this certificate of the inspectors does not express the true result of the electors' choice; if its effect is so destroyed or impeached by better proof that it ceases to have force as evidence, then the result in that district must be determined by other, and the best evidence that the nature of the case admits of.

If this certificate is proved to be false; if its falsehood is conceded or not controverted; if a state of facts is shown which proves that the result in that district was uncertain, and, if it was shown that it was not in the power of the inspectors to render it certain, then it amounts to no evidence to defeat that which is better When the truth has been so far inquired into and ascertained as to show that the certificate is not true, can it be the duty of the court to hold that, though false and uncertain, it may still be used as evidence? Can such a paradox be introduced into the law, as that a thing false in fact, may be true as evidence? Or this, that an official certificate, proved to be beyond the power of the officer to make certain in what it contains, shall still be held to be certain because it is certified? I think not. If such rules are not found to be established by authority, surely they should not be now first introduced to thwart that inestimable right of a freeman, the right to hold an office when such right is proved by the best evidence to be the will of the legal voters.

This case in its features is novel. It is distinguishable from all the cases found reported, in some respects. It is not a case of mere irregularity, so common in the books, which cast no uncertainty upon the result, or none but such as can be rendered certain. It differs from the case of *The People* v. *Minck*, 21 N. Y. 539. In that case, no evidence was offered to impeach the certificate, and it was, of course, held good *prima facie*. Nor is the case of *The People* v. *Pease*, 27 N. Y. 45, at all in point upon the question we are considering. That case only establishes the just rule, that a party may go behind the certificate of the inspectors and prove upon a trial before a jury, by the best evidence that the nature of the case will

admit of, what is the people's *will*—what is the *truth*—and may correct any error occurring by reason of any *negligence, mistake,* or fraud of the inspectors or others. But none of these cases lay down a rule to apply, where error, mistake, negligence or fraud has produced an uncertainty in a canvass, beyond the power of being corrected. The only case, or rather the highest authority and latest case that gives a rule in such an event, is *The People* v. *Cook,* 8 N. Y. 94. That case says: "If it be impossible for the inspectors to ascertain, certify and declare the number of genuine ballots, the whole should be rejected."

The certificate of the board of inspectors, produced in this case, shows that 652 votes were cast in this disputed district for the office of mayor, and that of these 460 were cast for the defendant, George H. Thacher, 113 for the relator, Edmund L. Judson, and 79 for one Thomas McCarty. This certificate, standing alone as *prima facie* evidence, would show the defendant elected to the office. The burden of proof to overcome this *prima facie* case, it is conceded, was then upon the relator. How then may this *prima facie* case be overcome? And what evidence is sufficient to destroy its effect?

The relator proceeded to attack the verity of this inspector's certificate. He showed by better and higher evidence, to wit, that of the electors themselves, that he received in that district 200 votes for that office, and that Thomas McCarty received 134 for the same office. As, *prima facie,* but 652 votes were canvassed by the inspectors, this higher evidence than the *prima facie* certificate left but 318 votes for the defendant—thus still electing the relator. It was never heard of before in the law of evidence, I think, that there could be allowed to a party, even as *prima facie* evidence, a large number of votes not canvassed for him, and that, too, without oral or other proof that they had been cast for him—that the *prima facie* evidence of a certificate, even after its impeachment, was sufficient to overcome the higher and better positive evidence that had impeached, contradicted and destroyed it.

It is not denied that the relator showed this certificate was false in its statement of the number of ballots cast for that office, in this, that the actual number was 729, not 652; nor was this urged. It could not be urged that the inspectors did not know that their certificate in that respect was untrue. If a state of circumstances existed at the canvass by which a part of the ballots were destroyed or abstracted, or the result made uncertain, the duties of the inspectors

was plain; it was a duty consistent with truth — consistent with official integrity. That duty was honestly and truthfully to certify and declare the fact which produced the uncertainty. *People* v. *Cook*, 8 N. Y. 94. There is no law, no official obligation, that requires a sworn officer to certify untruthfully, because he cannot certify the truth, or in the absence of certain knowledge, to guess at a result.

It would have been honest, it would have been consistent with official integrity, it was due to truth and justice, due to the highest public interests, that this board should have certified to the fact of the sudden and mysterious darkness that happened during the canvass; to the certain abstraction of votes; and for aught they knew, also to a change or substitution of votes, and to the uncertainty of the result. At all events, an honest, truthful certificate would have shown that the result was made uncertain.

It is undisputed that the canvass for mayor was out of the legal order of time. The box containing these ballots was the fourth canvassed. The votes canvassed in that box had all been turned out of the box upon the table, and lay in heaps before the inspectors, and were then being opened. While in this condition, a condition of all others most susceptible to the commission of a fraud, and while inspectors were surrounded by persons of doubtful repute, the gas-light was suddenly extinguished. Though candle-light was very soon obtained, and though during the darkness some of the inspectors honestly endeavored to secure the ballots from being interfered with, there is proof, certain proof, that they did not entirely succeed. They were interfered with by some person or persons during the moments of darkness. Certain it is, that when the light appeared, votes had been abstracted. Ballots were found strewed upon the floor under the table, and one of the inspectors was found away from the place he occupied at the table when the light went out, and there was very strong circumstantial evidence that different votes were substituted for the votes cast. Upon counting the votes found on the table after the light was restored, but 652 votes were found, though 729 had been cast in the box by the electors. The inspectors might have truthfully certified that from the votes found upon the table and afterward canvassed, the following was the result. Though the law furnishes no such form, truth required it. But their certificate was not made in the honest form suggested, and as required by duty. It was shown by the testimony

on the part of the relator, and not controverted by other evidence, that the result as certified was not true.

The relator further impeached this certificate by affirmative proof that 200 electors of that district voted for him, thus falsifying the return to the extent of 87 votes; and by like evidence that 136 electors in the same district on the same day voted for Thomas McCarty for the same office, thus further impeaching this certificate and return to the extent of 57 votes. The legal question then arises as to the effect of this *prima facie* evidence of the inspectors' certificate after being thus falsified and impeached. Is it then still in force? Though false, is it still legal evidence? Is the *onus probandi* still upon the relator further to impeach a thing proved and conceded to be false and uncertain? It was neither true, in fact, nor had the inspectors the means of making it certain and certifying a true result. They did not know that all the votes they canvassed and thus certified had even been in the ballot-box. They *did* know that all the votes that had been in the ballot-box were not canvassed. Admitting the certificate of the inspectors was *prima facie* evidence of the result in the first instance, and that the burden was first upon the relator to impeach it, yet when it became so impeached, both for its untruthfulness known to the inspectors, and impeached in that, the result of the ballot was not only uncertain, but the inspectors did not possess the means of making it certain, what, then, is the legal effect? On whom, then, is cast the burden of proof? Upon these points there was no conflict of fact for the jury. This became in this case, as it may become in others, a grave question — a question upon which great interests under our form of government may depend. It is a question that should have for its basis the support of integrity and truth — a question that lies at the very foundation of our system of government. Upon the decision of this question depends, or may depend, the means of detecting and exposing fraud and imposition — a question of the purity of the elective franchise, a question involving the sovereign right of the people. It should be so held as to be the means of correcting error and of securing the confidence of the people in the ultimate result of an election. Was it needful for the party attacking the verity of an official certificate, which is at most but *prima facie* evidence — a ministerial, not a judicial certificate — to go further than to prove it false and uncertain?

What is *prima facie* evidence? It is an inference or presumption

of law affirmative or negative of a fact, in the absence of proof; or until proof can be attained or produced to overcome the inference. Starkie defines it to be " that which not being inconsistent with the *falsity* of the hypothesis, nevertheless raises such a degree of probability in its favor that it will prevail if accredited by a jury, unless it be rebutted or the contrary proved." Vol. 1, p. 244. It is certainly the weakest of all evidence upon which legal action can be sustained, and ceases to be sufficient when rebutted or impaired by contrary and better proof. In this case, the *prima facie* evidence is that only 652 votes were cast for mayor at that poll; *prima facie*, only 113 were cast for the relator and only 79 for McCarty. In these respects it was rebutted and proved untrue. This certificate, then, was uncertain and untrue. The *prima facie* presumption of verity of the certificate then was overcome, destroyed. The only question that remains is, does any virtue still remain in this false document, which shall so control, as to overthrow the truth, and nullify this highest right of the citizen, that of enjoying the exercise of popular sovereignty, that of rights conferred by a pure and honest exercise of the elective franchise? I have found no authority in the jurisprudence of any civilized country that allows of an action being maintained or defended upon evidence admitted to be untrue. The nearest approach to such a rule is in the old English doctrine of libel. "The greater the truth the greater the libel," or *e converso*, "the greater the libel the greater the truth." In the jurisprudence of this country, and in the trial of causes, a more reasonable doctrine prevails, as I understand the rule.

In the examination of contested questions of fact, the *onus probandi* may, in the course of the trial, be thrown from one party to the other several times, according as the complexion of the proof may change. *Ross* v. *Gould*, 5 Greenl. 211. The books are full of illustrations and examples of this kind. Take the familiar case of a negotiable promissory note payable to bearer. The production of the note and proof of signature of maker and indorsers is *prima facie* evidence that it was given in the usual course of business and for value, but if the defense shall show that the note was obtained by fraud, or an illegal consideration, or without consideration, the *onus probandi* is changed, the *prima facie* evidence is destroyed, and the burden is then cast upon the plaintiff to show under what circumstances he obtained the note. The nature of the action, the pleadings and the proofs on trial, are to be considered in all cases, in

determining upon whom the onus lies at any given stage of the trial. Phil. Ev. C. & H., notes by Edwards, vol. 1, 684. If a question of fact remains in a case, or there is conflict, then it is a question for the jury, but where the fact is undisputed, when the falsity or uncertainty of the *prima facie* evidence is conceded, and when the proof is without contradiction, as in the case before us, that the official certificate is untrue, when it is certain that it cannot be true; when the extent of its falsity is uncertain, then it is for the court to decide upon whom the onus lies. I think the *prima facie* presumption of its verity is then destroyed; that there is nothing then left to sustain it. It is then impossible from the canvass and certificate to ascertain the number of ballots given for either candidate. If such uncertain result is produced with or without the fault of the inspectors, their duty is then clear. The court of appeals have prescribed what is then the duty of the inspectors. That duty is, not what was done in this case; it was not to certify to a falsity; not to certify by guess work when it was uncertain; not to certify to what they knew was untrue, but to certify and declare the fact which produced the uncertainty. *People* v. *Cook*, 8 N. Y. 94.

It is clearly apparent, I think, that the case was submitted, in part, to the jury upon a mistaken theory of the law, as to the legal force and effect of the inspectors' certificates. The learned judge correctly charged the jury: First. That the formal certificate of the canvass was sufficient evidence to begin with, that *prima facie* the party receiving it is entitled to the office; and also, "that it rested with the plaintiff to show affirmatively that he is entitled to the office." "And to do that, he must show that the result stated in the returns is not correct." It is conceded that the plaintiff did show that the result stated in the returns was not correct.

It is conceded that the relator had 146 votes majority, independent of that district, and, by the highest proof, it was shown that he received 200 more of ballots in that district for the same office. I assume, then, for so I hold the rule to be, that when the inspectors' certificate ceased to be *prima facie* evidence, when it was not only admitted, but proved to be both untrue and uncertain, its legal force, its *prima facie* presumptive character, had been destroyed.

It no longer proved the defendant entitled to the office. It remained then evidence of nothing but its falsity.

The canvass of the district was then, in law, a blank, so far as this certificate was in question, and so far as there was any legal

evidence then remaining of its result. Then the relator stood with 146 majority without that district; and this was increased by better legal evidence of 200 votes in addition within this district.

Resting there, the relator was entitled to the certificate of election. Resting there on the trial, until these 346 votes should be overcome by legal proof, he was entitled to a verdict. The onus had then been changed, and it rested upon the defendant to overcome this majority.

The *prima facie* evidence upon which the defendant had stood, had now ceased to be evidence for him. He had no *legal* evidence then of his election.

The defendant did not show upon the trial, but by this inspectors' certificate and return, (except upon the cross-examination of a few of the relator's witnesses), that he received any votes in that district at the election.

The test laid down by Phillips, as to which party has the onus at any given stage of the trial, is "to consider which party would be successful if no more evidence were given." Vol. 1, 812. This was then a question of law, a question for the judge, and he assumed it. He instructed the jury, "that in this aspect of the case, that they are not to assume any thing against the canvass and return which is not proved against them."

Stopping here, in one sense this instruction was well enough. But falsehood and uncertainty had then not only been proved, but was conceded. The jury should therefore have been charged to assume it. Enough had then been proved against it. But the learned judge did not stop there; he added, "that only so far as error is proved, is it to be taken into the calculation." The idea here communicated is, that though the canvass and certificate is false and uncertain, you are still to regard it as good, true and legal evidence in its effect; that neither falsehood nor uncertainty, as a whole and in general, are sufficient to destroy it any farther than to the extent its falsehood is proved in detail by the relator; that the onus still remains with the relator further to impeach it; that is, to impeach falsehood. The sound old maxim, "*falsus in uno, falsus in omnibus*," by this rule, is ignored as having no application in such case.

Let us see whether this theory is sound, and how, if established as a rule, it will work in practice. Suppose the inspectors' returns, instead of certifying that only 652 votes for mayor had been given,

which was untrue to the extent of 77 votes, had certified that 1,000 votes had been cast for the same office, which would have been equally untrue to the extent of 271 votes; and, suppose further, that the defendant's majority had been certified at just 271; just the extent to which the certificate was actually false. No possible truth proved by the relator by the highest evidence, according to this charge, could entirely overcome the *prima facie* evidence of this certificate. " *Only so far as error is proved it is to be taken into calculation,*" so is the charge.

It still remains evidence sufficient to confer an office. ' Could it be tolerated? Could it be held to be a sound rule as to the *onus probandi* in the admission of evidence, in an action to ascertain the true expression of the will of the electors? — as a rule to be adopted in practice while in the search for the truth as to the electors' wishes expressed by their votes, to hold that the *form and statement* of the inspectors' certificate, conceded to be both untrue and uncertain, shall, nevertheless, stand good; stand as truth; stand as legal evidence, except to the extent that the voters are called upon to contradict it?

In the supposed case of a certificate, false to the extent of 271 votes in excess of the actual number cast, by the rule laid down in the charge above given, the falsehood could not be overcome by truth. The 271 votes not actually given, but certified, are made equal — more than equal in law to 271 votes actually given. The impeachment made in this case by the 200 voters who swore they voted for the relator, would not be equal to the known conceded falsity in the return and certificate of 271 votes in excess of the true number. This would be a rule that truth is not equal to falsehood, if that falsehood is only found in an inspector's certificate. The true voice of the electors, proved by themselves, would thus be silenced by the conceded false certificate of the inspector; though the former is true and the latter conceded to be false, the latter shall prevail. Elections then, in future, are to be determined by *certificate*, not by *votes*.

But the case is even worse than this. With no *certain* evidence as to the number of votes that were cast in that district for the defendant, the learned judge instructed the jury that they had the right to allow to the defendant as votes given to *him*, all the votes cast for mayor which were not actually proved by witnesses to have been given for others; not merely the balance of the 652 votes cer-

tified, but also the 77 votes not even certified, and not canvassed at all by the inspectors. There is no inspector's certificate, and therefore no *prima facie* evidence as to these 77 votes. Upon what evidence, upon what *legal* ground, then, could these 77 votes, not canvassed or certified, be allowed to one of the parties? This, I think, is an erroneous theory. The objections to this theory sufficiently appear in the exceptions to the charge and in the refusals to the charge as requested, which I do not stop to detail.

I have not regarded it as at all necessary to examine the rulings of the court in the admission or rejection of evidence on the trial, nor the facts upon which frauds are charged against the inspectors, or of the persons surrounding them during the canvass; nor the evidence given in attempting to account for any abstraction or loss, or changes of ballots; nor for the remarkable discrepancy between the ballots cast by the electors and the number canvassed by the inspectors. That votes were abstracted is not controverted; it is hardly questioned on the argument that ballots were changed; it is not denied that the result was uncertain; it is clearly proved that the relator's vote was not truly certified.

I have adopted the conceded facts in this review; have examined somewhat the theories of the parties and of the court, upon the trial, and of the counsel upon the arguments before us. In the views I express, I intend to give no opinion upon the merits of the case, farther than appears from such facts and theories ascertained on the trial, and as confined to this one district. I have expressed my dissent from some of the legal views taken upon the trial, and propose to add some others, the result of which will be that legal errors were committed that require a new trial in the case. I base no part of my opinion upon the mere irregularities of the board of inspectors, as a board, or of individual misconduct of inspectors or of their clerks, in taking or receiving votes; or in the illegality of the order of canvassing the boxes of ballots, short of actual fraud. All such mere *irregularities* which are not of themselves shown to have changed the result, as distinguished from fraud, would not vitiate a canvass. This is undisputed, well-settled law.

None of these questions reach the material points upon which the decision must rest. Waiving all these, the important inquiries which strike at sacred rights are, was the certificate true? Was it either certain in result, or had the inspectors power to render it certain? If not, is it, in law, of any value as testimony? It seems

to me to call for but the exercise of the plainest common understanding to answer these questions. It was said in the court of appeals, in *People* v. *Cook*, 8 N. Y. 86, that the great object of the duty enjoined by law upon inspectors, is "first to afford every citizen having a constitutional right to vote, an opportunity to exercise the right," and also " to conduct the election in such manner *that the true number of legal votes can be ascertained with certainty.*" But suppose, for a reason, without any fraudulent intent on the part of the inspectors, *uncertainty* is produced as the result, or, as to the number of votes cast for a given candidate; such • uncertainty as to destroy the *prima facie* evidence; what is the effect of the uncertainty of a canvass so given? If the common judgment of men did not respond that which is the legal answer, it is found already given by the highest judicial authority of the State. In *People* v. *Cook, supra,* in the court of appeals, they say: " Should a gang of rowdies gain possession of the ballot-box during or after the close of an election, *before the canvass and destroy the whole or a portion of the ballots,* the whole should be rejected." Why? Because of the uncertainty of the result. Is the supposed case stated by the court of appeals more uncertain than the case at bar? If the uncertainty is beyond the power of correction or ascertainment, does it make any difference whether effected by a gang of rowdies or by the more quiet and secret movements of conspirators in darkness? And is this uncertainty sanctified or made better by a false certificate of the result? And should it be seriously urged to the court that such false certificate, based upon such uncertainty, is still legally effective? That it possesses life and moral vigor? That it remains and is sufficient evidence to maintain an action, or to sustain a defense, except to the extent that it is proved false in detail, though admitted to be false as a total?

If the whole should be rejected, where, then, is the onus?

If the uncertainty produced by a gang of rowdies with the ballot-box is cause of rejection of the whole for uncertainty without reference to intentional fraud on the part of the inspectors, then, I think, the learned judge was in error in charging the jury as follows: " You are to examine and see whether *intentional* fraud was committed *by the inspectors.* I can see nothing else than the *intentional* fraud of the inspectors, which would justify you in entirely setting aside the canvass. It must be a conviction in your mind that there was *intentional* fraud *upon the part of the inspectors,* and such a fraud

as altered the result, that is necessary in order to set aside the entire return." This portion of the charge, it is true, is in harmony with the whole theory upon which the trial proceeded, and with the views of the learned judge as to the law of this case, but I am not able to concur with this view. I regard the source from which the uncertainty proceeds as immaterial.

In this case, not irregularity only, but fraud, actual fraud, was committed by somebody, upon the result of the exercise of the elective franchise; a fraud which rendered the actual result uncertain — incapable of being certified. This fraud was susceptible of proof; it was proved. The proof was not controverted; votes were abstracted, which could only have been done by a fraud; and shall it be adopted as a rule of evidence that such a fraud can be sanctioned by courts and juries, because the perpetrator is not certainly proved to be the inspector? Must a citizen, by such a rule, lose his legal rights by fraud, because it is not proved to have been committed by particular individuals? Is the sacred right of the citizen, is truth to be sacrificed to mere form? Substance to shadow? Is *prima facie* presumption to be held of superior weight in the scale to the highest evidence of positive truth? If certifying to a known untruth by the inspectors is not a fraud, such a certificate should not, at least, be held to be honest, and entitled to more respect in courts than truth itself.

I think such a rule should not be introduced into the law of evidence. It would be as much an anomaly in law as it is in morals. It would be a rule by which an individual could be defrauded of his most sacred rights by a fiction; it would be a rule tending to demoralize public sentiment, and encourage officers to corruption in the discharge of their public duties.

I cannot concur in the views of the counsel of the defendant urged to us, that the official certificate of an inspector, after proof and even after the concession of *its* untruthfulness and consequent uncertainty, still possesses the legal effect of throwing the burden of proof upon the relator to such an extent as to compel him to prove an impossible negative. But if I am in error as to the rule of evidence, as to its effect, as to the change of the *onus probandi* during the trial, I think there was an error in the refusal of the learned judge to charge the jury, as requested by the plaintiffs' counsel as follows:

"If the jury believe from the evidence that preceding or during

the canvass of the mayor's box, ballots for mayor were either illegally abstracted from the box or table, or placed in the box or on the table, and it is entirely uncertain to what extent this was done, then the returns should be rejected, and each candidate credited, only, with the votes otherwise proved to have been cast for him, although none of the inspectors were concerned in the transaction.

There was certainly evidence in the case, not only tending to prove, but proving an abstraction of votes as well as evidence tending to prove a change of ballots.

There were questions of fact for consideration of the jury. By higher and better evidence than the inspectors' return. It was proved that at least 200 electors voted for the relator. The inspectors certify they found but 113 votes for him to canvass. What then became of the 87 votes not canvassed? So 134 electors testified they cast their ballots therein for McCarty. What became of the other 55 votes? Were they not abstracted? Why not allow the jury to pass upon this evidence? If these witnesses swore truly, votes had been abstracted. It added to the uncertainty of the return. This uncertainty was a question for the jury; it was a question affecting the credit, the verity of the return. So it also added to the evidence of its falsity. The inspectors certify that the defendant received 460 votes. The oral proof establishes that 334 votes were given for the relator and McCarty. This would make a total of 794 votes (62 more than was given). The poll lists show that this number cannot be true. The inspectors certify that 652 were given, a variation from this of 152 votes.

I think this impeachment was a most proper question for the jury, and that it was error to exclude it. It is logically, as well as physically certain, either that votes were abstracted that were given for the relator and McCarty; or, that votes had been added that had not been counted by the electors for the defendant.

This result, this uncertainty, might have happened without intended fraud of the inspectors. So far as it produced that uncertainty, the fraudulent intent of the *inspectors* is not as was assumed the *only* material issue.

Without proceeding further in detail to review the exceptions taken to the charge, it seems to me that the whole theory of the charge was the erroneously giving undue weight, importance and conclusiveness to a certificate and return of inspectors, on a trial of this character, instituted for the ascertainment of truth. On a trial

of the inspectors for misdemeanor, the theory adopted might be correct; but, on the trial of right between two individuals, where a truthful result between them was the question; where the only object was to ascertain the true number of genuine ballots cast in the district, and the true number cast for each party to the issue; then the conduct of the inspectors, except so far as it was calculated to develop truth and establish certainty, is wholly unimportant. Their official certificate, which is really but hearsay, or the declaration of third persons, adopted by the common law as *prima facie* evidence, from public policy, from a presumption that public officers have done .their duty, is, when impeached, falsified, without force vitality or effect in the establishment of truth.

The claimed power of an official, which is both uncertain and untrue, over better evidence, even over truth, is a doctrine that should never, in my opinion, find place in the jurisprudence of any civilized government. For these reasons, I concur in the result of the opinion of my brother Parker, that a new trial should be granted. I refrain from the examination of a multitude of exceptions found in the case. If I am right, the errors pointed out require a new trial.

MILLER, P. J. (dissenting.)  I am constrained to differ from my brother PARKER,* in the conclusions at which he has arrived in this case. The grounds upon which he is of the opinion that the judge erred upon the trial relate to the charge of the judge and his refusal to charge as requested, and I shall therefore examine, as briefly as the nature of the subject will admit, the various propositions discussed in reference to this branch of the case.

The judge, after referring to the proof upon the trial as to the number of votes, and stating what they were proved to have been, in his charge to the jury, said:

" Indeed, it is hardly claimed, I believe, upon either side, that 652 was the entire number of votes cast for mayor. It would hardly do to assume that the return is correct for this purpose and in this particular, and *not* accurate for other purposes and in other particulars. I do not see, therefore, that there is any propriety in taking 336 from 652, and assuming that only the remainder, or balance left, is to be allowed as representing the true number of votes cast for Mr. Thacher."

He then proceeded to make some remarks as to the number of

---

* The opinion of Mr. Justice POTTER was not given until after the dissenting opinion of MILLER, P. J., had been delivered.

votes cast for Judson and McCarty, and the whole number of votes, and said: "Deducting, therefore, the three hundred and thirty-six from the seven hundred and twenty-nine, it leaves three hundred and ninety-three votes which might have been given, and which, for aught that appears, were given for Mr. Thacher."

He subsequently, in the same connection, remarked: "Taking only those who read their ballots and the vote is one hundred and seventy-six for Judson and eighty-five for McCarty, making a total of two hundred and sixty-one. Deducting that number from seven hundred and twenty-nine, the total number cast in that district for mayor, as sworn to by Chapman, and as appears by the poll-list, and there remains a balance of four hundred and sixty-eight votes *which might have been cast for Thacher*. You will notice that these two results come out, the one a little over and the other a little under the number of votes returned by the inspectors as actually cast for Mr. Thacher 460. I have now given you my view in regard to the number of votes proved. I see no reason why you should deduct the number of votes proved to have been cast for Judson and McCarty from the *smaller* number of votes *canvassed*, and not from the larger number of votes *cast* at that poll. There is no dispute as to the number of votes canvassed. There were but six hundred and fifty-two votes there at that canvass; all three of the inspectors counted them and made that number. But that a larger number of votes was actually voted at that poll for mayor, *seems to be admitted by counsel upon both sides*. It seems to me, therefore, as I have said, that the deduction should be made from seven hundred and twenty-nine, and not from six hundred and fifty-two."

The counsel for the defendant excepted to that part of the charge in which he said: "I do not understand that they are entitled to have the vote deducted from 652." Also to that part of the charge in which he said: "You are to deduct the number from 729 and Thacher may have the balance." The judge did not make either of the remarks which the exceptions taken impute to him. As to the first exception, if it can be construed as covering what the judge actually said as to the propriety of deducting three hundred and thirty-six from six hundred and fifty-two, I think it was not well taken; for it is plain and unmistakable that there would be no propriety in deducting the votes claimed to have been cast for Judson and McCarty, from any other sum than the total number of votes cast for mayor, which the poll-list showed and which was shown by all the inspect-

ors, as I understand, and conceded by all parties to have been seven hundred and twenty-nine. Why then should the votes claimed for those candidates be deducted from the lesser number of votes, when the return of the inspectors shows that Thacher received even more than the difference between the votes claimed for Judson and McCarty and seven hundred and twenty-nine, the whole number of votes cast for mayor ? .

As to the second exception, it will be seen by reference to the charge, that the judge did not say, at any time, as is claimed in the exception, that after the deduction was made from 729 that Thacher might have the balance. It was an error therefore to assume that any such language was employed, and the fair construction to be placed upon the remarks made is, that after deducting from the whole number of votes 336, the difference might have been given, or for aught which appeared, were given to Thacher. And after deducting those which were claimed to have been read, 261, the balance, 468, might have been given for Thacher. And further, that it seemed to him that the deduction should be made from 729, not from 652.

I think that there can be no doubt that the judge was clearly right in saying that the deduction should be from the larger instead of the smaller number, and in the remarks that the 393 votes might have been given, or for any thing that appears, were given for Thacher. As the deduction stated was clearly proper, and the number remaining might have been, or were cast for Thacher, there was no error in this respect. The position, therefore, that the judge assumed that the difference between the lesser and larger sums *were* given for Thacher, without regard to the canvass and certificate of the inspectors, is erroneous. Nor was it, in my opinion, in any way proper, even if such a request had been actually made, to submit to the consideration of the jury the question whether the 393 votes were cast for Thacher, as it was plain what the fact was from the evidence introduced. The case did not turn upon any such disputed question, and the error of the counsel consists in overlooking how the proof actually stood. If the testimony showed, as is claimed, that Judson and McCarty had received 336 votes, they were only entitled to have that number counted for them. The return showed that Thacher had received 460 votes, and must be taken as true, except so far as it is impeached or proved to be erroneous, or unless there was fraud. Now, allowing the 336 votes to Judson and McCarty, it left from the whole number cast, which was 729, a

remainder of 393 votes, which certainly was a portion of the 460, to which Thacher was entitled. The 460 votes returned for Thacher should only be reduced so far as was inconsistent with the evidence of witnesses, which had been introduced and sworn, provided that evidence was to be relied upon for the purpose of showing the number of votes received by Judson and McCarty. In this respect the certificate should be considered as corrected, and giving to Judson and McCarty the full benefit of the evidence, and assuming that all the votes — those which were read, as well as those which were not read by the voters, were to be counted for them, there would be enough majority remaining to elect Thacher.

It must be borne in mind that the plaintiff held the affirmative of the issue, and was bound to make out a case. He must show affirmatively that the relator was elected and what votes he actually received in opposition to the return of the inspectors. He was only entitled to the number of votes proved and could not claim any beyond this. When the plaintiff proved that the relator and McCarty received a certain number of votes, it was only one step toward showing that he was elected, and it did not impose upon Thacher the burden of showing what votes he had received independent of the certificate. It only affected the return to the extent in which it proved that it was erroneous, and not beyond this. Thacher had a right to rely on the return, and allowing to the plaintiff all which he claimed, was entitled to the remainder of the votes cast. There was no proof that either the plaintiff or McCarty had the remainder, as they only proved a lesser number, and the return gave more than the remainder to Thacher.

In any point of view in which the exceptions to the charge which have been discussed may be considered, I think that there was no error.

The exception taken to the charge of the judge, to the effect that " nothing authorized the jury to reject the returns other than the conviction in their minds that it was the result of intentional fraud upon the part of the inspectors," was not, I think, well founded. This precise language was not used by the judge, and the part excepted to must be considered in connection with what was previously said upon the subject. The judge stated that it was claimed that there was intentional fraud on the part of the inspectors, and if it was shown that such was the fact, that the jury were " at liberty to reject their return entirely on that account."

He then proceeded to discuss the question as to what constituted fraud, referred to the testimony, as to what took place when the canvass was had, to the circumstance of the rejection of one ballot and putting another in the box when two had been given to the inspector, and the refusal to admit persons into the room where the canvass was going on, and concluded his remarks on this subject as follows:

"The principal event in the history of the canvass that attracts attention upon this question was the going out of the light, and what took place at that time. I do not think I should detain you here to discuss that transaction in detail. I leave that for your consideration. You are to find whether fraud was committed. I do not speak of the misconduct of outside parties, but you are to examine and see whether intentional fraud was committed by the inspectors. I can see nothing else than the intentional fraud of the inspectors which would justify you in entirely setting aside the canvass.

"It must be a conviction in your minds that there was intentional fraud on the part of the inspectors, and such a fraud as altered the result, that is necessary in order to set aside the entire return."

The exception relates to the last portions of the charge quoted, if it is at all available, and this had especial reference, as will be seen, to what occurred when the light was extinguished. It was not an independent proposition alone and of itself, but a remark made at the close, and after the judge had commented on all the other portions of the case, and without any apparent intention to put the decision of the entire case upon any such ground, solely. I think that the language employed in connection with the evidence was sound, and as favorable to the plaintiffs as the facts warranted, for the evidence was quite strong that the inspectors had acted throughout in entire good faith. As public officers, they were sworn to perform their duty. They were present during the few seconds which transpired when the room was in darkness, with their hands over the ballots, seeking to protect the same, and it is difficult to see how any change could have been made, or fraud have been committed, without their assent and connivance. The evidence did not prove that any person outside interfered with the ballots, or added or subtracted a single vote from the table. If it was done, the inspectors must have been participators in the fraud beyond any question, and

the court went so far, upon being requested, as to charge that the jury had a right to find that fraud was proved within the meaning of the law, when they found, from the evidence, the existence of circumstances from which fraud is a natural and probable inference.

The principle laid down in this portion of the charge excepted to was intrinsically right in the abstract, as the case stood, and in the absence of direct proof that fraud had been perpetrated by the introduction or abstraction of ballots, and in the face of the fact, that the inspectors, acting under oath, had determined to the contrary, no other safe rule could have been adopted. If any circumstances did exist from which even fraud might be inferred, the jury were allowed, by the answer to one of the requests, to charge as already stated, to take them into consideration. In view of all the facts and circumstances presented, I am of the opinion that the charge in this respect was clearly correct, and the true rule was laid down.

In connection with the exception last discussed, my brother PARKER has considered the seventh request made by the plaintiff's counsel to charge the jury — which was refused by the judge, and to which refusal it is claimed an exception was taken. It is as follows : " If the jury believe from the evidence that preceding or during the canvass of the mayor's box, ballots for mayor were either illegally abstracted from the box or table, or placed in the box or on the table, and it is entirely uncertain *to what extent this was done,* then the returns should be rejected, and each candidate credited only with the votes otherwise proved to have been cast for him, although none of the inspectors were concerned in the transaction."

It bears somewhat upon and it is, perhaps, appropriate to examine it, therefore, as identified with the charge in regard to intentional fraud by the inspectors. It will be observed that it is broad and comprehensive and required the judge to hold, that if any number of ballots, however small, even more than a single ballot, had been illegally abstracted or placed in the box so as to render it uncertain to what extent this was done, the return should be rejected and the parties be left to prove what votes they had received. No matter whether it changed the result or not ; no matter whether it was sure beyond contingency who was the successful candidate, according to this rule, the slightest variation or inaccuracy, which cast a doubt upon the subject, would authorize a rejection of the return. Nothing would be left to the honest judgment of the inspectors if this

were the rule, and in the confusion incident to such occasions, it would furnish opportunities for contests when there were no real grounds, thus transferring the canvass to the forum of the courts, instead of the place which the law designates. The court had already stated that fraud of the inspectors would justify the jury in disregarding the return, and I think this portion of the charge comprehended and covered any slight irregularity or error of the character indicated. If the evidence showed fraud of the inspectors either in the canvass or by ignoring plain rules of law and integrity, which should govern their action, then of course it should be vacated. And this very rule was embraced in the charge. But if the doctrine can be maintained, that the misconduct of outside parties, who, in the interest of one or more of the candidates, are induced to commit a fraud, without the knowledge or acquiescence of the inspectors, which in no way alters the result, can vitiate and destroy a return of a canvass, it would inevitably lead to the grossest of abuses. While mistakes should be corrected and the return varied as the judge did charge; when there is no evidence of fraud by the inspectors nor any testimony showing that ballots had been changed or interpolated, no good legal reason exists for setting aside the return. It is an entire mistake to assume that this request to charge embraced a case where the proof showed that ballots had been taken away and others put in their places, so that the result of the voting was rendered uncertain. No such proposition was embraced in the request made, and no such state of facts was presented. If such had been the intention of the counsel, he should have so expressed himself. As he did not, we cannot enlarge the character or effect of the language employed in the request, nor are we at liberty now to determine any proposition in that form.

It should be a strong and clear case of fraud which otherwise could not be corrected which would authorize the rejection of a return entirely. The inspectors are not vested with any such power; but when a fraud has been perpetrated, the ballots, or a portion of them destroyed, or others introduced surreptitiously into the box, so as to render it impossible to ascertain the number of genuine ballots, it is their duty to certify and declare the fact (*People* v. *Cook*, 8 N. Y. 93). If they omit to do this, and to certify as to the real state of the canvass, they would perpetrate a fraud, and the charge expressly provided against any such act. It is manifest, I think,

that the request to charge was clearly erroneous, and properly refused.

The foregoing remarks cover the grounds taken in the opinion of the learned judge in favor of a new trial. The other requests to charge, I think, are mainly covered by the charge as made, and none of them, in my opinion, are well founded. Although I have examined the various requests made and the refusal to charge as if duly excepted to, it is exceedingly doubtful whether valid exceptions were taken to any of them within the rule laid down in *Walsh* v. *Kelly*, 40 N. Y. 556 ; *Requa* v. *The City of Rochester*, 45 id. 129, 137, as it appears that the attention of the court was not called to each one of them separately after they had been handed to the court.

A number of other questions are raised by the learned counsel for the plaintiff, as to the rulings of the judge upon the trial, but I am unable to discover any error in any of the decisions made in regard to them. While it would be more satisfactory to discuss them at length, the limited time intervening before the commencement of another term prevents the performance of such a task. Suffice it, therefore, to say, after a careful investigation and full consideration of the various points raised, I am satisfied that the case was well tried at the circuit, that no errors were committed by the judge, and that a new trial must be denied, and the judgment and order affirmed with costs.

*Judgment reversed and new trial ordered.*