(36 Misc. Rep. 622.)

PEOPLE ex rel. CALIHAN v. HUNT, County Clerk.

(Supreme Court, Special Term, Monroe County. December, 1901.)

1. PRIMARY ELECTION—CANVASS OF RETURNS—REVIEW BY COURT.

The primary election law (Laws 1899, c. 473, § 8, subd. 4) provides that the county clerk, as custodian of primary records, shall canvass the returns, and for review by the court of any neglect of any officer in connection therewith. *Held*, that the power of the court to review the act of the clerk is exhausted when it determines that the canvass of the statements filed in his office, on the face of the returns, had been properly made, and it cannot receive affidavits of facts other than those shown by the returns on application for a mandamus requiring the clerk to issue a certificate of nomination to a particular candidate.

2. SAME—BALLOTS.

A candidate at a primary election is entitled prima facie to have a vote counted for him, if it be cast for him by his Christian name and his surname, without his middle name.

Application by the people, on the relation of Matthias J. Calihan, for a writ of mandamus to Charles L. Hunt, county clerk of Monroe county. Writ vacated.

William H. Driscoll and James M. E. O'Grady, for relator.

William A. Sutherland (William W. Armstrong, of counsel), for respondent.

NASH, J. This is an application for a peremptory writ of mandamus directed to the respondent, as county clerk and custodian of the primary records of the city of Rochester, commanding him forthwith to issue and deliver to the relator a certificate of his nomination as alderman of the Second ward of the city on the Republican ticket, in accordance with the primary election held in the said ward on the 17th day of September, 1901, or show cause to the contrary at this term of the court. The respondent, in obedience to the order to show cause, has made his return, annexing thereto as part thereof a certified copy of the statement of the canvassers of the said ward, showing the result of the primary election, from which statement it appears that the whole number of ballots on which votes were counted for the office of alderman were 379, of which Matthias J. Calihan received 186, Dr. John J. Evans 182, John Evans 9, M. J. Calihan 1, and James F. Poole 1. In his return the respondent states that he duly canvassed the statement filed with him by the inspectors, and duly prepared a certified statement of the result, and filed it in his office, in which he credited Matthias J. Calihan, for the office of alderman, with 186 votes, stated by the inspectors to have been received by them for Matthias J. Calihan, for said nomination, and 1 vote stated to have been received for M. J. Calihan, making 187 in all; and credited John J. Evans, for the same nomination, with 182 votes stated to have been received for John J. Evans, and with 9 votes stated to have been received for John Evans for such nomination, making 191 in all.

The primary election law (Laws 1899, c. 473, § 8, subd. 4) provides that the custodian of primary records shall forthwith proceed to canvass the statements filed in his office, which canvass shall be completed within the time prescribed, and shall thereupon prepare certified statements of the result of the primary elections of each party participating therein; and it is further provided that he shall deliver, upon demand, to any person who by the statements filed and canvassed is shown to have been nominated as a candidate for public office, a certificate of such nomination. The primary law is new, but the provisions thereof as to the duties of the canvassing officers are similar to, and in substance the same as, those which have always been enjoined upon boards of state and county canvassers of elections; and the law in relation to the counting of votes having thereupon abbreviations of the names of candidates, and the omission or addition of initial letters, has long been well settled. In the case of People v. Pease, 27 N. Y. 45, 84 Am. Dec. 242, where the name of the candidate was Moses M. Smith, there were votes cast for Moses Smith and for M. M. Smith. Judge Selden, in one of the prevailing opinions, said:

"According to well-settled rules, the board of canvassers erred in refusing to allow to the relator the nineteen votes given for Moses Smith and M. M. Smith, the addition of which to his unquestioned vote would have given him four majority over the defendant."

The law, it is said, knows but one Christian name, and disregards the omission of a middle name, or the insertion of one which does not belong to the name.

The duty of the respondent here in canvassing the returns of the inspectors at the primary election is the same as that of county canvassers in the canvassing of the returns of inspectors of election. He is required to prepare certified statements of the result of the primary election as it appears on the face of the returns, and, within the rule which the courts have held applicable, to allow to such candidate the votes on which the middle name or initials are omitted, as well as those on which the full name appears, as was done here by the clerk in allotting to John J. Evans the votes cast upon which the name John Evans appeared. The primary law provides for the review by the court of any action or neglect of the officers or members of a political convention or committee, or of any inspector of a primary election, or of any public officer, with regard to any right given to any elector, or any duty prescribed for any officer by the appropriate remedy of mandamus or certiorari. In addition thereto, it is provided that the court shall have summary jurisdiction to review such action or neglect, and in reviewing such action or neglect the court shall make such decision and order as, under all the facts and circumstances of the case, justice may require. In reviewing the action of the inspectors of primary elections, their entire proceedings at any election may be inquired into, and affidavits or proofs received as to the facts of the case, and whether in a given case their action has been legal or regular. The particular manner in which they have acted in receiving or rejecting ballots and counting and returning the vote may be reviewed, and whether they have properly exercised their judgment in matters requiring their decision. But the manner in which the canvassing officer shall perform his duties does not involve any matter of judgment or judicial action or determination whatever. He is required to canvass the statements filed in his office, and ascertain the result of the election by a computation of the votes shown by the returns to have been cast in (as it has been termed) an "arithmetical manner." The office of the court upon review is to ascertain whether the clerk has properly performed his duty. He could not go outside of the returns. Neither can the court here upon review: People v. Rice, 129 N. Y. 461, 29 N. E. 358. The power of the court to review the action of the clerk seems to be exhausted when it determines that the canvass of the statements filed in his office, upon the face of the returns, has been properly made. I cannot find anything in the primary law which authorizes the court to receive on review affidavits or proof of other facts upon which to determine the result of a primary election than those which are furnished by the returns:

In the moving affidavits for the order to show cause it is made to appear that there were three candidates for whom ballots were cast at said primary election, to wit, Matthias J. Calihan and Dr. John J. Evans and another John Evans; that at said election there were three sets of ballots, upon one of which appeared the name

of Matthias J. Calihan for nomination for alderman, upon another the name of Dr. John J. Evans, and upon another the name of John Evans; that these ballots were delivered, in accordance with the primary law, to each voter as he presented himself at the polls, one of which was voted and deposited in the proper box, and the other ballots in another box kept for that purpose; and that the said three ballots so voted were counted by the inspectors. It is shown in the moving affidavits that the other John Evans moved into the Second ward on the 11th day of September, 1901. These affidavits having been read in support of the motion, voluminous opposing affidavits were read, from which it appears that said other John Evans was not at the time of said primary election a bona fide resident of said Second ward, and never had been such resident, but was, and had been for several years, a resident of the Ninth ward in said city; that he was not an enrolled voter in the Second ward, but was in the Ninth ward; that he was ineligible to the office of alderman in said Second ward; that he was not at any time a candidate in said ward in said primary election for the office of alderman, as were the said Matthias J. Calihan and John J. Evans; that said third ticket was made up of names taken from the two opposing tickets, and fictitious names, or names unknown to the voters of said Second ward. It further appears that there were two opposing factions in the Republican party in said Second ward, between which for several months prior to said primary election an earnest and spirited contest had been carried on, one of which factions allied itself with Matthias J. Calihan, and the other with Richard Gardiner, and that during said contest, prior to said primary election, no other candidates for the office of alderman of said ward, by the names of Calihan or Evans, were mentioned, except said Matthias J. Calihan and Dr. John J. Evans; that it was expected that the name of said Richard Gardiner would be at the head of the ticket of one of the factions, and that of said Calihan at the head of the ticket of the other of said factions; that at said primary election the name of Richard Gardiner was at the head of the ticket of his faction for delegate to the city convention which was known as the "Gardiner Ticket," and the name of said Matthias J. Calihan was at the head of the ticket of his faction, known as the "Calihan Ticket." It further appears that in the evening of the 16th day of September, 1901, there were mailed sealed envelopes, postmarked 10:30 p. m. of that day, to many of the enrolled Republican voters known to be allied with said Gardiner, but not to his supporters or enrolled Republicans generally, each of which envelopes contained one of the so-called third tickets and a printed circular letter, which were evidently intended to reach the voters by noon of the next day. This circular letter stated that the Republican primary would open at 2 o'clock in the afternoon, and remain open until 9 o'clock in the evening, and proceeded as follows:

"Inclosed is the Gardiner ticket, and it is hoped that it will meet with your entire approval. This is intended to notify you of your duty, and reaches you shortly before the hour of going to the polls. Do not delay, but go to the primary and deposit the inclosed ballot as early in the afternoon as you can.

"[Signed]          The Executive Committee of the Association."

This third ticket and the circular accompanying it were discov-- ered by the Gardiner people. A protest was made by them at the polls against the use of what was termed a "bogus ticket." Objection was made to its being delivered with the other two tickets to the voters by the inspectors. The inspectors were equally divided upon the question, and the objection was not sustained. The purpose of this third ticket, properly characterized as "bogus," was to deceive and defraud the supporters of the Gardiner ticket, and to trick them into voting for John Evans as the Republican candidate for alderman,—a nonresident and not a member of the Republican party of the ward,—instead of voting for their candidate for alderman, John J. Evans. It must be assumed that the fraud was successful, in that it did deceive voters, two of whom testify that they inadvertently voted the fraudulent ticket. The legal effect of this fraud upon the actual result of the primary presents an embarrassing question. Whether, upon the trial of an issue to determine the right to the nomination, the nine John Evans votes intended for John J. Evans, if the fact were made to appear, should be counted for John J. Evans, or would have to be wholly rejected, or the election adjudged void on account of the fraud, are questions which cannot be determined in this proceeding. I have concluded to adhere to the plain letter of the statute, which requires the clerk to canvass the vote as it appears upon the statements filed by the inspectors. The alternative writ should be vacated and set aside, with costs.

Writ vacated and set aside, with costs.